No. 31,045.

GEORGE C. DIETRICH, *Appellant*, v. RETAILERS FIRE INSURANCE COMPANY OF OKLAHOMA, *Appellee.*

GEORGE C. DIETRICH, *Appellant*, v. RETAILERS FIRE INSURANCE COMPANY OF OKLAHOMA, *Appellee.*

(Consolidated.)

(21 P. 2d 900.)

Opinion filed May 6, 1933.

*F. M. Harris,* of Ottawa, *Randal C. Harvey, Paul L. Harvey,* both of Topeka, and *C. W. Crossan,* of Kansas City, Mo., for the appellant.

*Bennett R. Wheeler, S. M. Brewster, John L. Hunt, Margaret McGurnaghan* and *Ralph M. Hope,* all of Topeka, for the appellee.

The opinion of the court was delivered by

BURCH, J.: The action was one to reform and then to recover on fire insurance policies. Judgment was for defendant, and plaintiff appeals.

Plaintiff was engaged in the general mercantile business, and his stock of merchandise was contained in three buildings: a main one-story building, a brick and tile warehouse a short distance north of the main building, and a metal warehouse just north of the first warehouse. The buildings were connected with concrete walks, and were all used together in the conduct of the business. The stock of flour and feed was kept in the brick and tile warehouse. In the ordinary course of business, merchandise was received at the metal warehouse and was kept there until necessary to break packages and to replenish stock in the main building. Some commodities, such as salt, did not reach the main building. The business belonged originally to Ross Gault. In 1925 he sold to George C.

Dietrich and Robert S. Gault. Ross Gault and Robert S. Gault were brothers, and Dietrich and Robert S. Gault were brothers-in-law. In 1928 Robert S. Gault sold his interest to his partner Dietrich, the present plaintiff, who has since been sole owner.

Robert S. Gault was agent for the insurance company, and as such agent negotiated insurance for his brother, then for the firm of which he was a member, and then for Dietrich. Gault furnished data, and policies were written at the home office of the company. Policies were sent to Gault, who countersigned and delivered them. Each policy described the subject of insurance in the same way, and was for a period of one year. As policies expired they were renewed.

When the partnership became owner, the amount of the insurance on merchandise was $6,000, and on fixtures $250. Subsequently an inventory was taken, and it was found the merchandise amounted to about $12,000. The amount of insurance was not considered sufficient to afford proper protection, and a second policy was issued for $4,000. The two policies were renewed as they expired, the last renewal being made by the company on instruction by the agent to renew "as is."

In 1930 the metal warehouse at the north end of the line of buildings was destroyed by fire, and plaintiff suffered loss to the amount of $2,311.24. The description contained in the policies then in force, so far as material, follows:

"On stock of merchandise consisting chiefly of dry goods, notions, shoes, ready-to-wear, merchandise, meats, groceries, produce and flour, and such other merchandise as is usually kept for sale in general merchandise stores; . . . all only while contained in the one-story gravel roof brick and tile and frame building, occupied as a general merchandise store, situated north side of Central street, lots 15, 16, block 9, risk 29, city (town) of Richmond, state of Kansas. This item shall also cover said merchandise within one hundred (100) feet of the above described building while on sidewalks, streets, alleys, yards, detached platforms, and in or on vehicles or railway cars; also on said merchandise while on platforms in contact with above described building; . . ."

The building here described was the main store building. The building which was burned was on lot 15. The insurance company declined to pay, on the ground the merchandise in the building which burned was not insured. Plaintiff's idea was that he had not taken insurance merely on that part of his stock of merchandise which was contained in the main store, but on his stock of merchan-

dise. The agent of the company had the same notion. Hence the prayer for reformation to make the policies express the intention of the parties.

Clear manifestation of intention by both the agent and Dietrich that the insurance should cover all the property occurred when the amount of insurance was increased. After that the renewal policies were countersigned and delivered by the agent and were accepted by the insured as covering the entire stock of merchandise.

When the additional insurance was taken out the entire stock was inventoried, and not simply the stock in the main store. The insurance was only half the amount of the inventory, and plaintiff testified as follows:

"Q. Did you have some conversation with the agent, Robert S. Gault, of that company, as to what the policy covered? A. I don't remember the exact conversation. It was to this extent, however, that we had entered business on considerable borrowed money; that the man who had loaned us all that money had been kind enough not to ask for any money mortgage on the property. That left me feeling in justice to him we should carry the property reasonably insured. The loan to us was on the stock and fixtures, and that is what we were carrying the insurance on.

•    •    •    •    •    •    •    •    •    •    •    •    •    •

"Q. Did you tell him, as agent for the insurance company, to write an additional policy upon the property? A. Yes, sir. Our invoice the first of February showed stock in the neighborhood of $11,500 or $12,000, and the estimated value of the fixtures alone was around twelve to fourteen hundred dollars. I didn't feel that the insurance of $6,250 was ample to protect us in case of loss, or to protect our creditors, so I asked Mr. Gault to increase the insurance $4,000.

"Q. Upon what property? A. Upon our property.

"Q. Where was it located? A. On those two lots you have just mentioned.

•    •    •    •    •    •    •    •    •    •    •    •    •    •

"Q. I will ask you, Mr. Dietrich, whether at the time when they were rewritten it was your intention and belief that those policies covered all of the merchandise located in the three buildings on those lots? A. Yes, sir."

The agent testified as follows:

"About a year after we bought the business from my brother, the amount of the insurance was increased.

"Q. What happened that led to its increase? A. When the stock was invoiced, we found we had, according to the invoice, right around $12,000 in round numbers in stock, besides furniture and fixtures.

•    •    •    •    •    •    •    •    •    •    •    •    •    •

"The inventory had been made at that time, and covered all the merchandise and fixtures on those two lots, some of which was then in the metal building and some of it in the tile building.

"Q. Did Mr. Dietrich tell you anything about what he desired concerning an increase of insurance? A. Yes, sir.

"Q. What did he say? A. He said he wanted to carry insurance to cover everything so in case of fire we would be protected and the creditors would be protected.

"Q. Did he say what the everything was? A. In all our dealings everything covered the whole invoice.

.  .  .  .  .  .  .  .  .  .  .  .  .

"Q. When you talked with Mr. Dietrich concerning that increase, and with the gentleman who was the state agent, was it your intention to have the increase of insurance cover all of the property upon these lots, wherever located? A. Yes, sir."

The agent testified concerning subsequent policies as follows:

"Q. I will ask you, Mr. Gault, whether you believed at all these times that those policies covered all of that merchandise in the three buildings upon that lot? A. Yes, sir.

"Q. Was it your intention that it should so cover? A. Yes, sir."

The agent testified concerning the policies sued on as follows:

"Q. Now, Mr. Gault, I will ask you whether [when] you signed those policies as the agent of your company, it was your intention that the insurance evidenced by those policies should and did cover all of the merchandise in that whole establishment? A. Yes, sir.

"Q. Did you believe that it did? A. Yes, sir."

Both the agent and the insured testified they read the policies and were familiar with the provisions of the policies. They were cross-examined and cross-examined, and testified and testified, by one form of expression and another, to the effect they knew exactly what the terms of the policies were. The agent testified as follows:

"Q. You knew exactly what they contained? A. The way I interpreted it; yes, sir.

"Q. You mean when you say you thought that the policy covered all of the property, merchandise, wherever kept, that is the way you interpreted the policy as written? A. Yes, sir."

Plaintiff testified as follows:

"Q. That has been your contention all along, that this policy as it stood really covered the property that burned? A. That was my understanding."

The main store did not burn. The loss on merchandise which did burn amounted to 23.11 per cent of the total amount of insurance carried. It would be a strange thing if, under the circumstances narrated, Dietrich and Gault as owners, and Gault as insurance agent, intended to insure only some of the stock of merchandise, and that subsequently Dietrich as owner and Gault as insurance

agent intended to insure only some of the stock of merchandise. While the court did not specifically find the intention was to insure all the merchandise, the court did not find and could not find the intention was to insure only some of the merchandise, and the court rested its decision on conclusiveness of words in the policy which were understood by both insurer and insured. The court's conclusions of fact and conclusions of law follow:

"Conclusions of Fact.

"The policies upon which the suits are brought were issued in March, 1930, and after they were delivered to the plaintiff, Dietrich, he inspected them and was familiar with the contents and provisions thereof, as he had been of previous policies.

"There was not any misunderstanding on Dietrich's part as to the wording of the policies.

. . . . . . . . . . . . . .

"The plaintiff, Dietrich, and Robert S. Gault, the local agent of the defendant, were of the opinion that the policies of insurance as written covered any loss to the goods, wares and merchandise going to make up the plaintiff's stock in trade, whether they were located in the main building or the other buildings."

"Conclusions of Law.

"1. The policies of insurance in this case do not cover the loss of any of the goods, wares or merchandise of the insured other than while they are contained in the building described in the policies except under special contingencies which do not exist in this case.

"2. The plaintiff, Dietrich, is not entitled to have the policies of insurance reformed so as to make the defendant company liable for loss to goods, wares or merchandise contained in the building other than the main building, in the absence of fraud or misunderstanding as to the contents of the policies or misrepresentation of fact, none of which exist in this case.

"3. The fact that the plaintiff and the company's local agent, Robert S. Gault, were of the opinion that the policies covered the contents of the buildings other than the main building, does not entitle the plaintiff to either reformation of the policies or to any recovery thereunder."

It is quite likely the court rested its decision on a statement made in the opinion of this court in the case of *Brenn v. Insurance Co.*, 103 Kan. 517, 175 Pac. 383. The brief for defendant cites no authority for the decision of the district court except the Brenn case and the federal case cited in the opinion in the Brenn case.

The Brenn case was this: The insurance company was a mutual company, and by statute the by-laws of the company were part of every policy issued. The policy covered horses, mules and colts. Brenn had eleven head when the policy was issued, and eighteen

head when loss occurred. The policy was for $500, and amount of risk on a single animal was not stated. The insurance agent told Brenn before the policy was issued that the company would pay the full value of any animal he lost. He lost one animal, and sued for its full value, $130. The district court gave judgment for that amount. As interpreted by this court, the by-laws meant all Brenn could recover was one-eighteenth of $500, or $27.77.

The basis of the district court's judgment in the Brenn case did not appear in the record, and this court was obliged to speculate concerning what the district court did. Although reformation was not prayed for, specific prayer for reformation was not necessary, and the district court might have considered the policy as reformed to make the policy meet the agent's representation concerning what the company would pay. In discussing the subject of reformation, this court said:

"By the weight of authority an insurance contract may be reformed for a mistake of the applicant and the soliciting agent, although the latter had no authority to issue a policy or determine its contents. (14 R. C. L. 903, citing note, 11 L. R. A., n. s., 357.) Here, however, the facts indicate, not that the company's agent represented that matter was to be inserted in the policy which was omitted, but that, knowing the actual contents of the policy, he undertook to tell its legal effect, and stated it incorrectly through an error of judgment. Such a situation has been held not to authorize a reformation on the ground of mutual mistake. (*Travelers' Ins. Co. v. Henderson,* 69 Fed. 762.)" (*Brenn v. Insurance Co.,* 103 Kan. 517, 520, 175 Pac. 383.)

It will be observed the court neither approved nor disapproved the federal decision. Attention was merely called to the fact there was such a decision. The court then proceeded to make its own decision, leaving no room for doubt about what the decision was:

"But a consideration which disposes of this feature of the case is the fact that the statute under which the defendant is organized includes this provision:

" 'Every policy issued shall have attached thereto a printed copy of the note and application, also a printed copy of the by-laws and regulations of the company, which shall be signed by the president and secretary of the company and the insured, and shall become a part of the contract between the insurer and the insured.' (Gen. Stat. 1915, § 5319.)

"The defendant is a purely mutual company. The persons insured form the membership of the corporation. (Gen. Stat. 1915, § 5310.) The legislative intent clearly was that the by-laws should be made binding on the members and should constitute a part of every contract of insurance made, and that they should affect the measure of liability where they related to that subject. This purpose is not to be defeated by the expression by a soliciting agent of a mistaken opinion as to the force of a by-law. It is the meaning of the by-law itself, and not the agent's conception of it, that is to control." (p. 520.)

If the law were otherwise, reformation of a policy to meet the opinion of an agent would reform the by-laws themselves, which, as we used to say in mathematics, would be absurd. The result is, there is no analogy between the Brenn case and this one. In this case, there could be reformation of the policy to cover all of a stock of goods instead of part of it.

, The court found as a fact, from the undisputed evidence, there was no misunderstanding on Dietrich's part as to the wording of the policies. The second conclusion of law, omitting fraud and misrepresentation which are not involved, is that Dietrich is not entitled to reformation, in the absence of misunderstanding of the "contents of the policies." Assuming the conclusion of law is a conclusion from the facts found, "wording" and "contents" of the policies are the same thing. So understood, the second conclusion of law is erroneous. Section 1585 of Williston on Contracts (vol. 3, p. 2803) reads:

"Where a written instrument fails to express the intention of the parties because of a mutual mistake as to the construction or legal effect of the words of the writing, though there is no misapprehension as to what words have been used, reformation is allowed. It is not necessary, moreover, in order to establish a mistake which may be reformed, that it should be shown that particular words were misunderstood. 'It is sufficient that the parties had agreed to accomplish a particular object by the instrument to be executed, and that the instrument as executed is insufficient to effectuate their intention.' But in a few jurisdictions, if the parties knew the words in the instrument and intended to use those words, their misapprehension of the legal effect of the language will not be ground for reformation."

The rule approved by the text is supported by a very long list of authorities.

The rule stated by Williston was adopted by the American Law Institute:

"Except as stated in §§ 506 and 509-511, where both parties have an identical intention as to the terms to be embodied in a proposed written conveyance, assignment, contract or discharge, and a writing executed by them is materially at variance with that intention, either party can get a decree that the writing shall be reformed so that it shall express the intention of the parties, if innocent third persons will not be unfairly affected thereby.

"5. A contracts with B to guarantee certain debts due by C to B. The words of the contract are exactly as intended by both parties, but both understand that the legal effect of the words is to impose only a guarantee of collectibility. The writing will be reformed to express that understanding." (Restatement, Contracts, § 504, and illustration 5.)

An illustration of application of the rule may be found in the

case of *Maher v. Hibernia Insurance Co.*, 67 N. Y. 283 (1876). In that case an insurance policy was issued insuring a building "occupied as a residence." The phrase "occupied as a residence" constituted a warranty. In fact, the front room was occupied as a grocery. The matter was called to the attention of the insurance agent, who said it made no difference, the policy was all right as it was. There was a loss, and reformation of the policy was prayed for. In the opinion it was said:

"They meant to insure the building which was burned; they meant to correctly describe it; they used words which they thought did correctly describe it. It turns out that in this they were honestly mistaken. It is in the power of a court of equity, on being satisfied of that, to so reform and rewrite the contract, as that it shall state truly what the parties in fact agreed to and what they intended to write out as their agreement. It is true that they knew what words were used in the instrument. Doubtless they knew the ordinary meaning of the words. The evidence, however, authorized a finding that they mistakenly supposed that those words, when used in a contract for insurance, were proper terms in which to describe the building, intended by the plaintiff and accepted by the agent of the defendant, as the subject of that contract. It resulted, therefore, from that mistake, that the contract failed to express the fact as agreed upon between them." (p. 291.)

Illustrations might be multiplied. The latest federal decision applying the rule is that of *Shell Petroleum Corporation v. Corn*, 54 F. 2d 766 (C. C. A. 10th Circuit). In the opinion by McDermott, circuit judge, the cases decided by the supreme court of the United States and other federal courts are reviewed.

In this instance the court was convinced by the evidence and consequently found it was the opinion of both Dietrich and the insurance agent that the policies of insurance as written covered any loss to goods constituting plaintiff's stock in trade, whether located in the main store or in one of the warehouses. These opinions were not detached states of mind. They were the settled judgments of the insured and the insurance agent with respect to what was accomplished in a transaction relating to insurance of a stock of goods. The parties were mistaken. It seems the mistake originated before Gault became a partner, in a policy which he did not write, and the mistake was simply perpetuated throughout the series of policies. The understanding of the parties at the time the amount of insurance was increased was definitely established and, as indicated, the misdescription was brought into the policies sued on by the agent's direction to the company to renew "as is." While the words of the policies as units of expression were known, they did not express

what the parties desired to express by using the words, and in such cases it is the province and duty of a court of equity to reform the policies by employing words which do express the true intention.

Defendant says that if plaintiff can prevail, the description in a policy limiting coverage to a particular building amounts to nothing. It ought not to amount to anything when the descriptive words misdescribe. In the case of *Griswold v. Hazard*, 141 U. S. 260, the words of a bond did not express the intention of the parties to the instrument. In the opinion the court said:

"There was no mistake as to the mere words of the bond; for it was drawn by one of Hazard's attorneys, and was read by Griswold before signing it. But, according to the great weight of the evidence, there was a mistake, on both sides, as to the legal import of the terms employed to give effect to the mutual agreement. . . . A court of equity ought not to allow that mistake, satisfactorily established and thus caused, to stand uncorrected, and thereby subject a surety to liability he did not intend to assume, and which, according to the decided preponderance of the evidence, there was at the time no purpose to impose upon him." (pp. 283, 284.)

By the same token a mistake satisfactorily established ought not to stand uncorrected, and thereby permit an insurance company to escape liability on a policy which it wrote pursuant to misdirection of its agent, acting under an opinion, shared by the policyholder, that the policy did create liability.

The rate was higher on goods in the building which burned than on goods in the main building, and plaintiff was charged and paid the lower rate. Gault had a rate book, but apparently did not make careful use of it. Collusion, bad faith, or other improper motive, was not charged or proved or found, and the matter of rate does not prevent reformation. The same thing occurred in the case of *Hardware Co. v. Insurance Co.*, 97 Kan. 127, 154 Pac. 229. The syllabus reads:

"Recovery can be had on a fire insurance policy covering merchandise contained in different buildings situated on two adjoining lots, although the property insured is described as being situated on one of the lots, where the evidence shows that the insurance agent and the owner intended to insure the property while in the buildings on either or both of the lots."

The matter of rate may be adjusted by the judgment.

The judgment of the district court is reversed, and the cause is remanded with direction to enter judgment for plaintiff.

HARVEY, J., not sitting.

HUTCHISON, J., dissenting.