## MIKE OCCHIATO MERCANTILE CO. v. ALLEMANNIA FIRE INS. CO. OF PITTSBURGH.

### Civ. No. 3236.

United States District Court,
D. Colorado.

June 14, 1951.

Sam Parlapiano, Pueblo, Colo., for plaintiff.

Pershing, Bosworth, Dick & Dawson and Winston S. Howard, all of Denver, Colo., for defendant.

WALLACE, District Judge.

This action was instituted in the United States District Court for the District of Colorado to reform a fire insurance policy and recover thereon as reformed in the amount of $9,653.46. The plaintiff, Mike Occhiato Mercantile Co., is a co-partnership consisting of eight persons, and is resident in Pueblo, Colorado. The defendant, Allemannia Fire Insurance Co., has its home offices in Pittsburgh, Pennsylvania, but is duly authorized to do business in the State of Colorado. Reformation granted and judgment for the plaintiff in the sum of $9,653.46.

On November 19, 1948, and extending for a term of one year, defendant issued, through Rachel Bensik, its Pueblo, Colorado agent, a fire insurance policy, No. OC 68738, to "Mike Occhiato, D/B/as Occhiato Merchantile Company", for the protection against loss by fire, of a quantity of bourbon whisky located at "Bonded Warehouse 'A' of Kentucky River Distillery, District No. 45, situated Camp Nelson, Jessamine County, Kentucky."

A portion of the whisky owned by the plaintiff and stored in "Warehouse B" of the Kentucky River Distillery was destroyed by fire on October 20, 1949. Plaintiff seeks a reformation of the policy to include the whisky stored in "Warehouse

B", and a recovery thereunder of the value of the whisky destroyed, $9,206.11, plus storage fees and taxes in the sum of $447.35, amounting to a total claim of $9,653.46.

Plaintiff contends that it was the intent of the parties to insure all of the whisky that it may have stored at the distillery; that it at all times relied on the representations of the defendant's agent, Rachel Bensik, that such whisky would be insured; that the designation in the policy of "Warehouse A" was occasioned by the mutual mistake of the parties, and; that the plaintiff was without knowledge of the existence of the second warehouse designated "Warehouse B".

In October, 1945, Carl Occhiato, the managing partner of the Mike Occhiato Mercantile Company, approached Rachel Bensik and told her that he had some bulk whisky stored at the Kentucky River Distillery at Louisville, Kentucky, and asked her if she could get him some insurance on it. Mrs. Bensik advised him that she wasn't sure, but would let him know later. Shortly thereafter, she called Occhiato and told him: "Carl, we can get you the policy. We have an agent at Louisville, Kentucky, and he can get all the insurance there and we'll issue a policy." Carl Occhiato thereupon directed her to procure a policy for $2,000. Mrs. Bensik obtained the policy from the defendant, through its Denver, Colorado agent, Reed Pennington. Defendant sent the policy to H. V. Davis, the Louisville, Kentucky agent, who countersigned the policy and returned it to the defendant. The policy was then forwarded to the Pennington Agency in Denver, which in turn transmitted it to Rachel Bensik in Pueblo. Rachel then mailed the policy to Carl Occhiato. The policy received by Occhiato designated the insured as "Mike Occhiato, D/B/as Occhiato Mercantile Company", and the location of the insured goods as "Bonded Warehouse A" of the Kentucky River Distillery. The original policy was followed by three renewal policies, each for an increased amount of coverage, and each styled in the same manner as the original policy. The third renewal is the policy upon which this action is predicated.

It is the defendant's contention that since the policy was issued to "Mike Occhiato, D/B/ as Occhiato Mercantile Company", the "Mike Occhiato Mercantile Company" is not a party to the insurance contract and cannot sue thereon. At the time that Rachel Bensik received this application for insurance, she had been an acquaintance of the members of the Mike Occhiato Mercantile Company for some fifteen years and had written numerous insurance policies for the firm. She possessed adequate knowledge that the policy was to protect firm property and not individually owned property. It was her intention to insure firm merchandise and it was through her error that the insured was not properly described. There is little room for dispute that Rachel Bensik was the agent of the defendant and that her knowledge will be imputed to the defendant as principal. One who solicits or receives an application for insurance on behalf of an insurance company, or transmits to that company an application for insurance, is the agent of the insurance company. 87 Colo.St.Ann. (1935) 19, par. 9; Merchants' Mut. Fire Insurance Co. v. Harris, 51 Colo. 95, 116 P. 143; Vertrees v. Head & Matthews, 138 Ky. 83, 127 S.W. 523. The knowledge of the agent under such conditions will be imputed to the principal. Weghorst v. County Fire Ins. Co., 96 Colo. 564, 45 P.2d 625; Universal Insurance Co. v. Arrigo, 96 Colo. 531, 44 P.2d 1020; Home Insurance Co. of New York v. Gaines, 74 Colo. 65, 218 P. 908.

It is further contended by the defendant that the policy insured only the whisky stored in "Warehouse A", and that there can be no reformation of the contract, for there is a want of mutual mistake, which is an essential condition for reformation. Reformation is an extraordinary remedy granted by the courts to afford to the parties the benefit of their contract as they actually intended it to be. It revises the express words of the contract to show the true intent of the parties. In order that reformation may lie, it must be found

that the parties have made a mutual mistake, or that there has been a mistake by one of the parties and fraud or inequitable conduct on the part of the other. Columbian Nat. Life Insurance Co. v. Black, 10 Cir., 35 F.2d 571, 71 A.L.R. 128; Williston, Contracts, § 1554, p. 4355. It has been held that where the circumstances justify reformation, the court may in its discretion, without a preliminary decree of reformation, give effect to the transaction as if it had been reformed, even in an action at law. Hill v. Stanolind Oil & Gas Co., 119 Colo. 477, 205 P.2d 643. Further, the mere fact that the reformation is sought after an extended period of delay, or even after loss has occurred, will not operate to deny the courts' assistance. Home Ins. Co. of New York v. Gaines, supra; St. Paul Fire & Marine Ins. Co. v. Jones, 5 Cir., 98 F.2d 448, certiorari denied 305 U.S. 651, 59 S.Ct. 244, 83 L.Ed. 421; Cecil v. Kentucky Livestock Ins. Co., 165 Ky. 211, 176 S.W. 986; Commercial Casualty Ins. Co. v. Connellee, 156 Okl. 170, 9 P.2d 952; Davis v. Universal Ins. Co., 169 Okl. 593, 38 P.2d 932.

At the time that plaintiff took out his original policy, it was his intent, and also the intent of the defendant's agent, Rachel Bensik, to insure *all* of the whisky that plaintiff had stored at the Kentucky River Distillery. Mrs. Bensik testified at the trial that she had supposed that the policy was to cover all of the whisky stored at the distillery, and even stated that she was surprised to learn that there was not adequate coverage.

When the original policy was issued to plaintiff, there was only one warehouse in existence at the Kentucky River Distillery. That warehouse was designated "Warehouse 65". In September, 1947, a second warehouse was built and a re-designation of the warehouses then occurred. The old warehouse became known as "Warehouse 65A" or simply "Warehouse A", and the new warehouse became known as "Warehouse 65B" or simply "Warehouse B". Thus, although the location of the insured goods was stated in the original policy as "Warehouse A", there was not a warehouse so designated in existence when the

policy was issued. Carl Occhiato testified that he did not give the company this designation, and he is corroborated by Rachel Bensik. The evidence shows that neither Carl Occhiato nor any member of the firm had ever been to Kentucky, and that they did not possess any knowledge of such a warehouse either at this time or when the second warehouse was built.

In the case of Aetna Insurance Co. of Hartford, Conn. v. Powers, 1942, 190 Okl. 116, 121 P.2d 599, the court allowed reformation of a fire insurance contract and recovery thereon. In that case, the defendant through its local agent issued to plaintiff an insurance policy whereby it undertook to insure a dwelling house, household goods, a barn, a blacksmith shop, a storehouse, and the contents of the storehouse. The policy, from the description *given by the insured,* located *all* of the property on a tract of land lying outside the town of Milo, Oklahoma. Actually, the storehouse was located *in* the town of Milo. The storehouse and its contents were destroyed by fire and the insured sought recovery. Defendant stated that since its local agent relied upon the information given him by the insured with reference to the location of the storehouse, the evidence failed to show any *mutual mistake* and that therefore, reformation was not proper. The court declared that it was the apparent purpose of the parties to insure the storehouse and its contents as well as the other property named in the policy. The court allowed reformation of the policy so as to permit recovery for the loss.

In the case of Dietrich v. Retailers' Fire Ins. Co. of Oklahoma, 1933, 137 Kan. 533, 21 P.2d 900, the court stated in the syllabus: "When the words of a fire insurance policy limit the risk to goods in one of three adjacent buildings situated on two lots housing a stock of general merchandise, and the words are not misunderstood, but both the insured and the insurance agent were of the mistaken opinion the policy as written covered any loss to goods in any one of the buildings, the policy may be reformed to express what the parties intended."

In construing this contract of insurance, the general purpose is to give it that construction which is most probable and natural under the circumstances, so as to attain the object which the parties had in contemplation at the time of making the contract. This court cannot reach the conclusion that plaintiff had intended to insure only a portion of the whisky which it had stored at the Kentucky River Distillery and assume the risk of loss by fire as to the remainder.

■ Defendant has stated that in order to establish the existence of the mutual mistake, the evidence must be "clear, convincing and indubitable". This appears to be a consolidated test drawn from the decisions of several courts, and imposes upon the plaintiff an extraordinary burden of proof with which this court cannot agree. The evidence required to show a mutual mistake need only be clearly convincing and satisfactory to the court, or, as some courts have stated it, "clear and convincing". In Hartigan v. Norwich Union Indemnity Co., 1933, 188 Minn. 48, 246 N.W. 477, 478 it was stated: "To reform a written instrument the evidence must be clear, persuasive, and convincing; or the same thought may be expressed in different words but they must not go as far as to require proof beyond a reasonable doubt."

■ Shortly before the expiration of the second renewal policy, Carl Occhiato requested Rachel Bensik to obtain for him some type of policy whereby he could automatically increase the coverage of his whisky as additional amounts were stored. Such a policy is referred to as a "Monthly Reporting Policy". Mrs. Bensik stated that she didn't know if she could obtain that type of policy or not, but would investigate and let him know. Shortly thereafter, Carl Occhiato called her and asked where his other policy was. Mrs. Bensik replied that she didn't know what was wrong and advised him to continue with the same type of policy that he had been using. Occhiato agreed that this should be done. On December 30, 1948, a third renewal policy for $15,000 was issued for the period between November 19, 1948, and November 19, 1949, and was styled in the same manner as all of the preceding policies. However, there was attached thereto a "rider" which made this a Monthly Reporting Policy under the terms of which plaintiff had a duty to make monthly reports as to the change of quantity of whisky stored, or the change of any location of the goods. Occhiato did not notice this provision, but merely looked at the outside of the policy to determine the amount and that it was the firm's policy. Defendant contends that plaintiff cannot recover because of his failure to report the change of quantity and location as required in the policy. This defense may not be interposed here for when there is a renewal of a fire insurance policy, the insurer must call attention to any change in the terms and, if it does not, the change cannot be a part of the contract, and the renewal is subject to reformation. Ouachita Parish Police Jury v. Northern Ins. Co., La.App., 176 So. 639. The defendant failed to call to the attention of the plaintiff the changes in the terms of the policy. In fact, after his last conversation with Rachel Bensik, there was no reason for him to anticipate that the policy which he had received was any different from the ones under which he had been operating.

■ Defendant further contends that the plaintiff is guilty of laches, in that he has not read the terms of his contract, and that he was negligent in not determining, from the invoices and warehouse receipts which he has received from the distillery, just what was the true location of his whisky. A party may lose his right to reformation where he is guilty of negligence or laches. However, the courts are extremely reluctant to deny reformation on such grounds and usually hold that mere failure to read the policy and note any error in its provisions will not be sufficient to destroy the right to reformation. Home Ins. Co. of New York v. Gaines, supra; St. Paul Fire & Marine Ins. Co. v. Jones, supra; Metropolitan Life Ins. Co. v. Brown, D.C.Mass., 45 F.Supp. 728; Metropolitan Life Ins. Co. v. Levy, 133 N.J.Eq. 77, 30 A.2d 571. Nor will

the failure of the plaintiff to note from the invoices and warehouse receipts that the whisky was being stored in a different warehouse constitute such negligence as to preclude relief. Of the 44 invoices received by the plaintiff, only 12 designated any location of the whisky. The value of the whisky shown on these 12 invoices was $4,296.53, whereas the value of the whisky shown on all of the invoices was $18,274.18. Of these 12 invoices, only 6 referred to "Warehouse 65B" or "Warehouse B". The value stated in these 6 invoices was $2,167.27. The invoices referring to the warehouse designation were not received in sequence, but were occasionally interspersed with the others. This is not adequate to put the plaintiff on notice of a change of the conditions under which he had originally obtained his insurance. All of the warehouse receipts received by the plaintiff designated the warehouse in which the whisky was stored. However, all warehouse receipts received prior to June 1946 referred to "Warehouse 65". Those from June 1946 to October 1947 referred to "Warehouse 65A", and those dating from October 1947 until the fire in October 1949 showed "Warehouse 65B". There was never anything to indicate to the plaintiff that the designation "A" or "B" was anything more than a subdivision of the original "Warehouse 65". In fact it should be noted that the designation "Warehouse 65A" was employed even *prior to* the construction of the second warehouse. In consideration of the status of the invoices and warehouse receipts, there would be no grounds upon which to predicate negligence on the part of the plaintiff. Particularly is this true when it is remembered that none of the partners had ever been to Kentucky.

 Defendant has suggested the necessity for apportioning any recovery for the loss in warehouse 65B with the total amount of whisky stored at the distillery. The court can see no reason for such an apportionment. Plaintiff has suffered a loss of $9,653.46; he is protected by insurance in the amount of $15,000. There is no stipulation in the policy for an apportionment in the event of a loss. Under these facts plaintiff is entitled to recover for the full amount of his loss.

Counsel are directed to submit a journal entry in conformity with this opinion within ten days from this date.