340 F.2d 719
 In the Matter of Orval WYSE, doing business as Wyse Brothers
Turkey Farm, Bankrupt.
PIONEER-CAFETERIA FEEDS, LTD., Appellant,
v.
Willard A. MACK, Trustee in Bankruptcy, Appellee.
 No. 15642.
 United States Court of Appeals Sixth Circuit.
 Jan. 25, 1965.
 
 Milton Boesel, Jr., Toledo, Ohio (Milton C. Boesel, Jr., Toledo, Ohio, on the brief), for appellant.
 Robert B. Gosline, Toledo, Ohio (arthur S. Newcomer, Newcomer & Shaffer, Bryan, Ohio, Shumaker, Loop & Kendrick, Toledo, Ohio, on the brief), for appellee.
 Before WEICK, Chief Judge, O'SULLIVAN, Circuit Judge, and PRETTYMAN, Senior Circuit Judge.[1]
 WEICK, Chief Judge.
 
 
 1
 This case originated in the bankruptcy proceeding of Orval Wyse, which was pending before the referee in bankruptcy in the District Court for the Northern District of Ohio.
 
 
 2
 Appellant, Pioneer-Cafeteria Feeds, Ltd., filed an amended proof of claim with the referee alleging that $282,943.47 United States dollars was due it from the bankrupt on a contract of guaranty signed by him. The trustee in bankruptcy filed objections to the allowance of this claim. After hearing, the referee allowed Pioneer's claim as an unsecured claim against the bankrupt's estate in the amount of $87,554.83 United States, but postponed payment of any dividend on it until other unsecured creditors of Wyse had received dividends of 26.43% Of their claims, which the referee found was the percentage on its claim that Pioneer had already received out of the assets of the bankrupt's estate.
 
 
 3
 Pioneer filed a petition for review of the referee's order, which was submitted to the District Court on the certificate of the referee, oral arguments and briefs. The District Court adopted the findings of fact and conclusions of law of the referee and dismissed the petition for review. Pioneer filed a timely motion to amend the findings, which was denied by the District Court. Within thirty days thereafter, Pioneer filed its notice of appeal.
 
 
 4
 The bankrupt, Orval Wyse, for many years had been engaged in raising turkeys and selling turkey eggs in the general area of northwestern Ohio and neighboring states. Shortly prior to September 5, 1958, he extended his operations to an area near Exeter, Canada, but in partnership with one, Neil D. Campbell. Pioneer sold and delivered feed to this partnership on credit.
 
 
 5
 Later Wyse and Campbell organized a corporation under Canadian laws, with the name of Northland Turkey Farms, Ltd. (hereinafter called Northland), which took over the assets and business of the partnership. Wyse was its principal shareholder.
 
 
 6
 Pioneer required Wyse, his wife and Campbell to sign a contract of guaranty before extending credit to the corporation. In the pertinent provisions of the contract, the guarantors agreed to:
 
 
 7
 '* * * guarantee the due payment and discharge of all liabilities to you (Pioneer) of Northland Turkey Farms Ltd of Box 84, Exeter, Ontario (herein called the Customer) whether in respect of loans or goods sold on credit or otherwise and whether incurred before or after the date hereof, whether matured or not and whether absolute or contingent, together with any costs and expenses reasonably incurred with respect to any such liabilities or any securities therefor or on account of taxes, wages, insurance or otherwise.
 
 
 8
 '2. This shall be a continuing guarantee, and shall secure the general balance due or that may be due from time to time and at any time from the Customer to you, notwithstanding any payments from time to time made to you or any settlement of account or any other thing whatsoever.
 
 
 9
 '3. You shall not be bound to exhaust your recourse against the Customer or other parties or the securities you may hold, nor to value such securities, before requiring payment from the undersigned.
 
 
 10
 '5. All debts and liabilities present and future of the Customer to the undersigned are hereby postponed to the liabilities of the Customer to you and all moneys received by the undersigned thereon shall be received as trustee for you and shall be paid over to you.'
 
 
 11
 Subsequent to the signing of the guaranty contract, Pioneer sold feed to Northland on credit. Wyse sold and delivered turkey eggs to Northland on open account.
 
 
 12
 Wyse filed a voluntary petition in bankruptcy in the District Court on September 30, 1959, and was adjudicated bankrupt. At the time of his bankruptcy, Northland owed Wyse $239,899.98, Canadian dollars, for turkey eggs. This asset was listed in the schedules filed in the Wyse bankruptcy proceeding.
 
 
 13
 Northland filed its voluntary petition in bankruptcy in the Bankruptcy Court of Ontario, Canada, on November 2, 1959, and was later adjudged bankrupt. Wilmer J. Eicher, Receiver in bankruptcy of Wyse, filed claim in the Northland bankruptcy estate for $239,899.98.
 
 
 14
 Pioneer filed its claim in the Northland bankruptcy proceeding for $135,203.11 Canadian, and valued security held by it at $100,000. On February 18, 1960, Pioneer filed a new and substituted claim in the Northland bankruptcy proceeding for $142,482.73 Canadian, and valued its security at $64,854.44. The security held by Pioneer was an assignment of the proceeds of sale of 30,406 turkeys belonging to Northland. After prolonged negotiations with Northland's trustee in bankruptcy, Pioneer settled its secured claim for 50%. Pioneer received from Northland's trustee $27,602.06 Canadian as a secured claimant and received a final dividend of $11,923. Canadian on its unsecured claim.
 
 
 15
 The claim of the Wyse bankruptcy estate against Northland was allowed as an unsecured claim by the Canadian bankruptcy court, in the amount of $239,899.98, on which it was entitled to a dividend of $24,901. Canadian. In a proceeding instituted by Pioneer in the Canadian bankruptcy court to enforce the subordination provisions of the guaranty contract, which was taken to the Supreme Court of Ontario In Bankruptcy, the court ordered that by virtue of the guaranty contract,
 
 
 16
 '* * * dividends payable by the trustee in bankruptcy of the estate of Northland Turkey Farms, Limited, to the trustee of the estate of Orval Wyse, a bankrupt, shall in the distribution thereof be paid to Pioneer-Cafeteria Feeds in accordance with this declaration, to the extent of the liability of the estate of Northland Turkey Farms Limited in bankruptcy to Pioneer-Cafeteria Feeds Limited.'
 
 
 17
 The Northland trustee, in obedience to this order, paid the dividend of $24,901. on the claim of the Wyse bankruptcy estate to Pioneer. This dividend amounted to 26.43% Of Pioneer's claim against the Wyse estate.
 
 
 18
 On December 17, 1959, Pioneer filed its proof of claim in the Wyse bankruptcy for $149,350.51 Canadian, as a general unsecured claim. On April 17, 1962, Pioneer filed an amended claim for $282,943.47, based on the same allegations as its original claim except it was calculated as of September 30, 1959.
 
 
 19
 The referee found as a fact that at the time Wyse was adjudicated bankrupt, Pioneer's records disclosed only $2,815.92 Canadian, owing to it from Northland. The referee further found that Pioneer's claim on the guaranty contract was unliquidated and contingent, but could be reduced to a liquidated amount by estimation. He applied on the claim payments made by Northland prior to its bankruptcy and the dividends which Pioneer received from the Northland bankruptcy on its secured and unsecured claims, including the dividend on the Wyse estate's claim. He allowed the claim for the balance in the amount of $87,554.83, but ordered that no dividends be paid on it until Wyse's creditors had received 26.43% Of their claims, which was the percentage Pioneer received on its claim against Wyse by reason of the payment to it of the dividend on the Wyse claim in the Canadian bankruptcy of Northland.
 
 
 20
 Pioneer contends that the judgment of the Supreme Court of Ontario in Bankruptcy, which ordered the dividend on Wyse's claim paid to it in accordance with the subordination provisions of the guaranty contract, was res judicata, and may not be relitigated in the Wyse bankruptcy. It relies on Heiser v. Woodruff, 327 U.S. 726, 66 S.Ct. 853, 90 L.Ed. 970 (1946).
 
 
 21
 There can be no question but that the Canadian bankruptcy court had exclusive jurisdiction over the administration of the bankrupt Northland's assets in its possession and control. In the distribution of dividends to creditors, it had the right to determine to whom the dividends should be paid.
 
 
 22
 Pioneer and Wyse were both creditors of Northland. Agreements between creditors providing for subordination or postponement of their claims, have been recognized and enforced in bankruptcy courts. Bird & Sons Sales Corp. v. Tobin, 78 F.2d 371 (C.A. 8, 1935); In Re Aktiebolaget Kreuger & Toll, D.C., 20 F.Supp. 964, aff'd 96 F.2d 768 (C.A. 2, 1938).
 
 
 23
 It is to be noted, however, that the enforcement of subordination agreements between creditors of the same bankrupt, affects only their rights and does not interfere with or change the rights of other creditors.
 
 
 24
 In the case at bar, the Canadian bankruptcy court had no jurisdiction over the administration of the assets in the Wyse bankruptcy. The Canadian court did not determine the issue involved here, namely, whether Pioneer's claim should be subordinated on equitable principles, to the claims of other creditors of Wyse. This was not in issue in the Canadian bankruptcy proceeding and could not properly have been raised there, as the District Court had exclusive jurisdiction over the administration of the assets of the Wyse bankruptcy.
 
 
 25
 In Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939) it was claimed that the bankruptcy court could not examine into a state court judgment and disallow or subordinate it as a claim on the ground of res judicata. Mr. Justice Douglas, who wrote the unanimous opinion of the Court, said in part, at pages 302-303 of 308 U.S., at page 243 of 60 S.Ct.:
 
 
 26
 'In the first place, res judicata did not prevent the District Court from examining into the Litton judgment and disallowing or subordinating it as a claim. * * * Nor was there presented to the state court the question of whether or not the Litton judgment might be subordinated to the claims of other creditors upon equitable principles. * * * It is therefore plain that the issue which the bankruptcy court later considered was not an issue in the trial of the cause in the state court and could not be adjudicated there.'
 
 
 27
 The Court concluded, at pages 310-311 of 308 U.S., at page 247 of 60 S.Ct.:
 
 
 28
 'Though disallowance of such claims will be ordered where they are fictitious or a sham, these cases do not turn on the existence or non-existence of the debt. Rather they involve simply the question of order of payment. * * * Where there is a violation of those principles, equity will undo the wrong or intervene to prevent is consummation.
 
 
 29
 'On such a test the action of the District Court in disallowing or subordinating Litton's claim was clearly correct.'
 
 
 30
 The case of Heiser v. Woodruff, supra, relied on by Appellants, is not apposite. There the issue of fraud in obtaining a judgment had been twice litigated in the Federal Courts in cases in which the trustee in bankruptcy was a party. The Court held that the trustee could not relitigate the issue of fraud a third time in the bankruptcy court. Mr. Chief Justice Stone, who wrote the opinion for the Court, said that the case of Pepper v. Litton, supra, 'lends no support for a different view.' Chief Justice Stone further said, at pages 732-733 of 327 U.S., at page 856 of 66 S.Ct.:
 
 
 31
 'It is true that a bankruptcy court is also a court of equity, Local Loan Co. v. Hunt, 292 U.S. 234, 240, (54 S.Ct. 695, 697, 78 L.Ed. 1230, 93 A.L.R. 195), and may exercise equity powers in bankruptcy proceedings to set aside fraudulent claims, including a fraudulent judgment where the issue of fraud has not been previously adjudicated. Pepper v. Litton, supra (308 U.S. 306, 60 S.Ct. 245, 84 L.Ed. 281). In appropriate cases, acting upon equitable principles, it may also subordinate the claim of one creditor to those of others in order to prevent the consummation of a course of conduct by the claimant which, as to them, would be fraudulent or otherwise inequitable.'
 
 
 32
 Bankruptcy courts are invested with jurisdiction at law and in equity. 11 U.S.C. 11, sub. a. One of the fundamental principles of bankruptcy administration is equality among unsecured creditors. Sampsell, Trustee v. Imperial Paper Corp., 313 U.S. 215, 61 S.Ct. 904, 85 L.Ed. 1293 (1941).
 
 
 33
 The guaranty contract was an unrecorded agreement, of which none of Wyse's creditors had notice. Although it may have been good between the parties, when Pioneer received the dividend on Wyse's claim from the Canadian bankruptcy, equity required subordination of Pioneer's claim filed in the Wyse bankruptcy case, until the other unsecured creditors of Wyse had received a like percentage of their claims. Pepper v. Litton, supra.
 
 
 34
 Pioneer contends that the District Court should have allowed its claim in the amount of $282,943.47, instead of $87,554.83. This issue becomes material only if the Wyse bankruptcy pays creditors in excess of 26.43% Of their claims. The trustee in bankruptcy of Wyse has estimated a dividend of about 25%.
 
 
 35
 We have heretofore pointed out that Pioneer filed its claim in the Canadian bankruptcy against the principal debtor, Northland, for only $135,203.11, of which $100,000. was secured, and that it later amended its claim for $142,482.73, of which $64,854.44 was secured.
 
 
 36
 On December 17, 1959, Pioneer filed its claim in the Wyse bankruptcy for $149,350.51. About two and one-half years after bankruptcy, Pioneer amended its claim against Wyse, asking for $282,943.47. It claims that this was the total amount of credit which had been extended to Northland as of September 30, 1959, and although not due and payable, it was entitled to collect this entire amount from the Wyse bankruptcy, without giving any credit for payments which it collected from Northland subsequent to the Wyse bankruptcy, or for dividends which it received from the Northland bankruptcy on its own claim and on the claim of Wyse.
 
 
 37
 The trouble with this argument is that it treats Pioneer's claim as liquidated on the date of the Wyse bankruptcy, whereas the referee in bankruptcy determined that it was contingent and unliquidated on that date. We find no error in the referee's determination of this issue.
 
 
 38
 Liability of Wyse on the guaranty contract was contingent on Pioneer's selling feed on credit to Northland in future, and on Northland's failure to pay therefor in accordance with the terms of sale. On the date of the Wyse bankruptcy, only $2,815.92 was due Pioneer from Northland. Pioneer continued to extend credit after the Wyse bankruptcy until Northland's bankruptcy. The fact that Pioneer filed claims for different amounts, not only in the Northland bankruptcy but also in the Wyse case, does not support its argument that the obligation was liquidated and certain.
 
 
 39
 Because Pioneer's claim was unliquidated and contingent on the date of bankruptcy, this does not mean that it cannot be proved and allowed.
 
 Section 63 of the Bankruptcy Act provides:
 
 40
 '(a) Debts of the bankrupt may be proved and allowed against his estate which are founded upon * * * (8) contingent debts and contingent contractual liabilities; or (9) claims for anticipatory breach of contracts, executory in whole or in part, including unexpired leases of real or personal property; * * *.
 
 
 41
 '(b) Where any contingent or unliquidated claim has been proved, but, as provided in subdivision (d) of section 93 of this title, has not been allowed, such claim shall not be deemed provable under this title. * * *' 11 U.S.C. 103.
 
 Section 57 of the Act provides:
 
 42
 '(d) Claims which have been duly proved shall be allowed upon receipt by or upon presentation to the court, unless objection to their allowance shall be made by parties in interest or unless their consideration be continued for cause by the court upon its own motion: Provided, however, That an unliquidated or contingent claim shall not be allowed unless liquidated or the amount thereof estimated in the manner and within the time directed by the court; and such claim shall not be allowed if the court shall determine that it is not capable of liquidation or of reasonable estimation or that such liquidation or estimation would unduly delay the administration of the estate or any proceeding under this title. * * *' 11 U.S.C. 93
 
 
 43
 As before stated, the referee in bankruptcy liquidated the claim by allowing it for the full amount of all credit extended by Pioneer to Northland and applying as credits thereon payments which it received from Northland and the dividends on its secured and unsecured claims from the Northland bankruptcy, including the dividend on the Wyse claim. The referee found that Pioneer has already received payment of a total of about 71% On its amended claim.
 
 
 44
 Pioneer's claim became liquidated, not on the date of the Wyse bankruptcy, but on allowance by order of the referee on October 19, 1962. In estimating the amount due on Pioneer's claim, it was the duty of the referee to apply thereon any payments which it had received up to the date of the allowance.
 
 
 45
 The rate of exchange to be applied was that which existed on the date of the order allowing Pioneer's claim against Wyse. Die Deutsche Bank Filale Nurnberg v. Humphrey, 272 U.S. 517, 47 S.Ct. 166, 71 L.Ed. 383 (1926); Restatement, Conflict of Laws 424 (1934).
 
 
 46
 We see no merit in the argument of Appellee that the notice of appeal was from the order of the District Court denying the motion to amend findings, and therefore the only issue before the Court is whether the District Court abused its discretion in denying it.
 
 
 47
 It has been held that an order denying a motion for additional findings is interlocutory and not appealable. Spampinato v. City of New York, 311 F.2d 439 (C.A.2, 1962).
 
 
 48
 The filing of the motion to amend under Rule 52(b) of the Federal Rules of Civil Procedure, extended the time for appeal from the order dismissing the petition for review. Rule 73(a) Federal Rules of Civil Procedure; Gager v. Bob Seidel, 300 F.2d 727 (C.A.D.C., 1962); United States v. Pan American World Airways, Inc., 299 F.2d 74 (C.A.5, 1962), cert. denied 370 U.S. 918, 82 S.Ct. 1556, 8 L.Ed.2d 499, rehearing denied371 U.S. 856, 83 S.Ct. 17, 9 L.Ed.2d 93; Papanikolaou v. Atlantic Freighters, Ltd., 232 F.2d 663 (C.A.4, 1956).
 
 
 49
 A misdescription in the notice of appeal of the order appealed from does not invalidate the appeal. State Farm Mutual Automobile Insurance Co. v. Palmer, 350 U.S. 944, 76 S.Ct. 321, 100 L.Ed. 823 (1956) reversing 225 F.2d 876 (C.A. 9, 1955); Hoiness v. United States, 335 U.S. 297 (1948); Marlowe v. Baird, 301 F.2d 169 (C.A.6, 1962). The notice of appeal may be amended. Preble v. Johnson, 275 F.2d 275 (C.A.10, 1960).
 
 
 50
 The appeal was timely. This Court had jurisdiction. It was clear to us that Pioneer intended to appeal from the order of the District Judge dismissing the petition for review, and we have so regarded it.
 
 
 51
 Affirmed.
 
 
 52
 PRETTYMAN, Senior Circuit Judge (concurring).
 
 
 53
 This is an appeal from an order of the United States District Court for Northern Ohio confirming orders of the referee in a bankruptcy matter. The bankrupt was one Orval Wyse, who, with a partner, had been engaged in raising turkey poults. The business grew, and the partners formed a corporation, Northland Turkey Farms, Ltd. The operation was conducted in Canada and the United States.
 
 
 54
 Northland bought eggs from Wyse on open account. It bought feed from Pioneer-Cafeteria Feeds, Ltd., upon an account guaranteed by Wyse. On September 30, 1959, Wyse went into bankruptcy in Ohio, and about a month later, on November 2, 1959, Northland went into bankruptcy in Canada.
 
 
 55
 In the Canadian bankruptcy of Northland, Pioneer filed a claim,[1] which was allowed in part.[2] And Pioneer received from the Northland bankruptcy estate $27,602.06 Canadian[3] as a secured claimant and $11,923.00 Canadian as an unsecured claimant.
 
 
 56
 Before it would extend credit to Northland, Pioneer had required Wyse to guarantee the account and also to subordinate to Pioneer his own receivables from Northland. In the Northland bankruptcy Wyse (through his trustee in bankruptcy) filed a claim for $239,899.98 Canadian. The claim was allowed, and a dividend of $24,901.00 Canadian was declared on it. However, the Canadian court ordered this dividend to be paid to Pioneer under the subordination clause in the contract between Wyse and Pioneer.
 
 
 57
 In the Wyse bankruptcy in Ohio, Pioneer filed a claim under its contract with Wyse whereby he had guaranteed Northland's account. Pioneer stated its claim in the amount shown by its account with Northland on the day (September 30, 1959) Wyse filed in bankruptcy. But the referee held that on that date the account was contingent, except for a small amount. He therefore liquidated the claim on an estimation[4] and allowed it as thus estimated.[5]
 
 
 58
 The amount thus allowed, as footnote 4 hereto shows, was $94,224.00 Canadian. The referee then applied the rate of exchange on the date of the judgment of allowance (October 19, 1962).[6]
 
 
 59
 The referee noted that Pioneer had received from the Northland bankruptcy estate $24,901.00 Canadian. This payment had been a dividend on Wyse's claim and was paid Northland by reason of Wyse's subordination agreement, pursuant to the order of the Canadian court. This amount is 26.43 per cent of Pioneer's allowed claim in the Wyse bankruptcy. The referee ruled that Pioneer could be paid no dividends from the Wyse bankruptcy until other unsecured creditors of Wyse had received 26.43 per cent of their allowed claims.
 
 
 60
 Pioneer says the decision of the Canadian court respecting the subordination of Wyse's claim against Northland was res judicata by comity and that therefore the referee in the Wyse proceeding could not treat the dividend of $24,901.00 as being received by Pioneer from Wyse. But the issues in the two courts were not the same, since the rights of Wyse's other creditors were involved in the American proceeding but not in the Canadian one. Pioneer further says the guaranty agreement covers the entire account of Northland, whether matured or not, absolute or contingent, and required no notice to be effective. But, although in a sense the guaranty by Wyse covered all the Northland account, no liability accrued under it until Northland filed in bankruptcy. Pioneer further says the amounts received by it from Northland (i.e., from that bankrupt estate) should not be applied to reduce Pioneer's claim against Wyse. But Pioneer's claim against Wyse arose from the guaranty and so was contingent until the day Northland filed in bankruptcy. As a contingent claim it could be allowed only by liquidating it on an estimated basis. Any 'estimation' must relate to the final net, and so all payments on the original gross must be deducted. Pioneer also says the exchange rate on the date of the filing of Wyse in bankruptcy (September 30, 1959) should be applied. But, as we have pointed out, Pioneer's claim, being contingent and unliquidated on September 30, 1959, was not allowable on that day. Under the established authorities the rate of exchange should be applied as of the date the claim became allowable.
 
 
 61
 The court holds against Pioneer on all the foregoing points. I concur in those holdings and in the affirmance of the order of the District Court.
 
 
 
 [1]
 Sitting by designation from the U.S. Court of Appeals, District of Columbia Circuit
 
 
 [1]
 Pioneer's original claim against Northland, filed on November 9, 1959, was for $135,203.11 Canadian and was partly secured. In this claim Pioneer valued its security at $100,000.00 Canadian. On February 18, 1960, Pioneer filed an amended claim for $142,482.73 Canadian. In the amended claim Pioneer valued its security at $64,854.44 Canadian
 
 
 [2]
 Pioneer's claim was allowed for $142,482.73 Canadian; however, Pioneer consented to an adjudication which compromised its claim to security
 
 
 [3]
 The referee in the Wyse proceeding recites this figure of $27,602.06 (our J.A. 29(a)), but in his finding of fact No. 15 (our J.A. 34(a)-35(a)) he shows two figures-- $26,413.08 and $1,188.00-- which total $27,601.08
 
 
 [4]
 In the accounts of Pioneer the purchase price of feed sold to Northland was entered as of the date of sale, but these amounts were not payable until later dates fixed by descriptive clauses in the contract (such e.g., as the seventh month after delivery, or one week after the marketing of flocks of turkeys, or at the option of Pioneer upon declaration that the whole of the moneys payable by Northland were due and payable). On September 30, 1959, the date Wyse went into bankruptcy, Northland's account on Pioneer's books showed a debit balance of $257,239.86 Canadian. On November 2, 1959, the date Northland went into bankruptcy, this account had been reduced to $122,795.08 Canadian. To this amount the referee added $3,000.00 Canadian as rent due Pioneer and $7,953.00 Canadian as 'Growers' fees' due Pioneer, giving a total of $133,748.08 Canadian as Northland's debit account with Pioneer. From this amount the referee in the Wyse bankruptcy subtracted the amounts which Pioneer had received as dividends on its claim against the Northland Bankruptcy estate, which dividends were $27,601.08 Canadian, as a secured claimant, plus $11,923.00 Canadian as an unsecured claimant, or a total of $39,524.08 Canadian. The unpaid balance of $94,224.00 Canadian was the amount which the referee in the Wyse bankruptcy allowed to Pioneer by reason of the guarantee
 
 
 [5]
 30 STAT. 560 (1898), amended, 52 STAT. 866 (1938), 11 U.S.C. 93, sub. d
 
 
 [6]
 The referee's amended order allowing the claim was dated October 19, 1962, but in his finding of fact No. 15 (our J.A. 34(a)-35(a)) he recites that the exchange rate on October 9, 1962, was applied