In the Matter of JOE NEWCOMER FINANCE COMPANY, a Colorado corporation, Debtor.

No. 34452.

United States District Court
D. Colorado.

Feb. 13, 1964.

**388**

Philip Hornbein, Jr., and Roy O. Goldin, Denver, Colo., for the trustee.

Leo Rector, Colorado Springs, Colo., for the demand note holders.

Bennett & Heinicke, Robert E. Cole, Colorado Springs, Colo., for debenture note holders.

C. Henry Roath, Denver, Colo., for Joe Newcomer.

DOYLE, District Judge.

The movants herein are holders of debenture notes issued by the Joe Newcomer Finance Company, the debtor herein.[1] They seek a determination by this court that they are entitled to the status of general creditors. It would appear that there are some 63 such note holders and that the face value of these obligations totals $210,793.52. These were long term obligations which paid high interest rates ranging from six per cent to twelve and one-half per cent per annum. The sums which were invested by these debenture note holders followed an intensive, indeed, a saturation advertising program. In the year 1962 the sum of $132,000.00 was spent; in 1961 the advertising expenditure was $100,000.00; in 1960, it was $39,000.00 and in 1959 it was $23,000.00. Apparently, the intensity of the advertising solicitation campaign was in direct proportion to the unfavorable financial condition; the debtor's finances became progressively worse year by year. Although the debtor was ostensibly a loan company, relatively little effort was expended in making small, or consumer loans. Seemingly, the debtor's officers invested the funds of the depositors, whether debenture holders or demand note holders, in business ventures of various kinds. These ventures invariably failed.

The basis for the present motion is: *first*, that the notes in question are securities which were not registered in accordance with either the State or Federal securities laws; and, *secondly*, that fraud was practiced in obtaining the deposits. A third point urged is that the debenture notes are so vague and am-

---

1. (The Chapter X proceedings were filed April 26, 1963.)

biguous that the subordination provisions are not enforceable.

It is to be noted that the Trustee has taken the position that under all of the circumstances it would be highly inequitable to uphold the subordination provision. On the other hand, the demand note holders who are the largest group of creditors [2] oppose the petition on various grounds, including the statute of frauds, limitations provisions, and, more importantly, that fraud is incapable of adjudication in a summary proceeding such as the present one.

As a further prelude to a discussion of the legal issues, it is important to further note the provisions of the subject debenture notes, a copy of which note is appended hereto. This is a gilt-edged document which promises much, but at the same time actually guarantees little, if anything, beyond acknowledging receipt of the money and declaring the terms of the obligation.[3]

Our view of the case does not require consideration of all of the contentions and counter-contentions of the parties. The threshold issues as to whether the document in issue, by its terms, actually subordinates the claims of the holders, and if so, whether such provisions should be enforced, are determinative.

## I.

### Whether the so-called subordination provisions effectuate the subordination purpose.

■ There are two provisions in the note which at least arguably have to do with subordination. The first of these provides:

" * * * The interest on these notes shall be payable only out of earnings of the corporation and the principal represented hereby, and interest thereon, shall be subordi-

nated to the claims of all other general creditors, secured or unsecured, including banks."

The question is whether the payment of principal or of interest, or both, was by reason of the above clause subordinated to other debts. In order to conclude that principal was subordinated one would have to insert a semicolon after the word "corporation." As it is written, it provides that the *interest* shall be payable only on earnings of the corporation and the principal represented. It then goes on to say that "interest thereon" shall be subordinated. Although the comma after "thereon" detracts somewhat from this meaning and although such a meaning makes little sense, it nevertheless strongly suggests that it was interest thereon which was subordinated. It may well be that the officers of the debtor intended to have both principal and interest as a subordinated debt. On the other hand, it may well be that they intended to create such an ambiguous provision that no one could be certain what, if anything, was subordinated.

Some clue to the debtor's intention can be obtained from the actual operation of the company. Its policy was to credit interest from incoming funds (its widespread advertising kept the money coming in), at least until the last few months of its existence. When a creditor requested interest, such payment came from funds furnished by other depositors, since it is not apparent that there were any genuine earnings, at least during the latter phase of the operation. Thus, the company could well have intended to pay interest out of principal and therefore the conduct of the debtor does not help the demand note holders.

The ambiguity in the wording makes it difficult to hold that general subordina-

2. The holders of these notes were promised a lower rate of interest but were privileged under the terms of the deposit, to have access to the funds. However, the debtor could not have paid very many of these and if a run had occurred this fact would have become apparent.

3. Generally the term was long; in some instances it was as long as ten years.

tion was an express provision of the instrument.

The second provision which deals with subordination is found in the last paragraph of the instrument. This provides:

> "As further security of the payment of these notes, there has been transferred, assigned, and pledged by the undersigned, to Joe W. Newcomer, as Trustee, its accounts receivable, notes and bills receivable, not otherwise pledged, choses in action, franchises, contracts, and all other intangible rights of every kind and description, and all additions thereto or replacements thereof, which pledge is subject to the provision that it shall not affect the right of the company to sell, assign or discount its accounts, bills, or notes receivable, either with or without recourse, or to assign or pledge its accounts receivable, notes and bills receivable, choses in action, franchises, contracts, and other intangible rights for the purpose of obtaining credit, and which pledge likewise is subordinated to the claims of all other general creditors, whether the said creditors be secured or unsecured."

It is noteworthy that although this provision speaks of further security, there was no "other" security provided, if indeed this could be regarded as security. This paragraph purports to set up a trust with Joe Newcomer as trustee. The trustee supposedly presides over an "open bottom" sinking fund. It is not apparent from the evidence that this trust was ever set up or that it was even contemplated. Yet, had such a trust been created, no doubt the claims of the debenture holders would have been subordinated to other general creditors at least as far as any special fund is concerned. This, however, falls short of creating a general subordination. Its manifest purpose was merely to create an impression that the debenture holder had some kind of security.

Regardless of what was intended, it is clear that since no fund was created, there are no assets which could be distributed on a preferred basis. Thus it must be concluded that this clause is likewise ineffectual in terms of creating a preference.

## II.

### Whether a subordination provision should be upheld under the present circumstances.

█ Section 65, sub. a, of the Bankruptcy Act (Title 11 U.S.C. § 105, sub. a) provides that:

> "Dividends of an equal per centum shall be declared and paid on all allowed claims, except such as have priority or are secured."

Neither the priorities created by Section 64 (11 U.S.C. § 104), nor matters of security, are within the scope of our problem here. But Section 65, sub. a, does not prohibit unequal distribution of dividends where there is a priority given by a lawful contractual arrangement between the parties. In re Aktiebolaget Kreuger & Toll, 96 F.2d 768 (2nd Cir. 1938); Bird & Sons Sales Corp. v. Tobin, 78 F.2d 371, 100 A.L.R. 654 (8th Cir. 1935). In support of the contention that we should give effect to the subordination provision, the demand note holders rely on In re Aktiebolaget Kreuger & Toll, supra; Elias v. Clarke, 143 F.2d 640 (2nd Cir. 1944), and In re National Discount Corporation, 212 F. Supp. 929 (W.D.S.C., 1963). These cases, and other cases upholding subordination provisions (see cases cited in National Discount, supra, 212 F.Supp. at 931, 932; Cf. In re Goodman-Kinstler Cigar Co., 32 Am.B.R. 624) are distinguishable from the instant case. In National Discount, the court gave effect to a subordination clause in the bankrupt's published audit reports, stating that the debentures held by four of its related corporations were subordinate to bank loans. This clause had been relied upon by the bank creditors who advanced loans without knowledge of any infirmity

in the subordination provisions of the debentures. In Elias v. Clarke, the court allowed enforcement of subordination provisions which were contained in convertible obligation certificates issued as an option to holders of "Convertible Debenture Certificates." The holders were, by resolution of the board of directors, given the option of taking either the subordinated obligations or preferred stock. The call of the Convertible Debenture Certificates was found to have been made in good faith. The option to take the subordinated obligation certificates was advantageous to the holders of the Convertible Debenture Certificates because the subordinated certificates were subordinated only to senior obligations of the debtor, whereas the acceptance of the preferred stock option would have subordinated these holders' claims to all obligations of the debtor. In re Hicks-Fuller Co., 9 F.2d 492 (8th Cir. 1925).

■ The equities present in the above cases are not found in the instant case. Here there is no evidence that demand note holders relied upon the subordination provisions in advancing funds to the debtor. Nor is this a case where the existing creditors agreed to subordinate their claims in order to obtain additional financing for the debtor. Thus, the subordination provision can not be upheld on the theory that the demand note holders are creditor beneficiaries of a third party beneficiary contract between the bankrupt and the subordinated debenture note holders. Cf. In re Itemlab, Inc., 197 F.Supp. 194 (E.D.N.Y., 1961).

The demand note holders have argued that the subordinated debenture note holders accepted the subordination feature in bargaining for higher interest rates, and for this reason it would be inequitable to allow them to avoid their subordinated status. However, it does not appear that there was ever an express intent to accept such status; on the contrary, these holders, from what appears, were merely informed that they were to receive the higher interest rates in exchange for the longer maturity period necessary before the notes were redeemable with interest. These holders were not sophisticated in the sense that they would be likely to give accurate legal scrutiny to the rather ambivalent wording of their documents. Nor were the documents ever placed in a posture which would permit public scrutiny as required by law. The bankrupt failed to register the issue in accordance with either the Colorado or Federal securities laws.

■ A court of bankruptcy, in passing on the allowance of claims, must sit as a court of equity and must be, consistent with the Bankruptcy Act, guided by equity and good conscience. Continental Illinois Bank & Trust Co. of Chicago v. Chicago, Rock Island & Pacific Railway Co., 294 U.S. 648, 55 S.Ct. 595, 79 L.Ed. 1110 (1935); Bankruptcy Act, Section 2 (Title 11 U.S.C. § 11); Local Loan Co. v. Hunt, 292 U.S. 234, 54 S.Ct. 695, 78 L.Ed. 1230 (1934); Hanssen v. Wingren, 121 F.2d 1011 (10th Cir. 1941).

> "In the exercise of its equitable jurisdiction the bankruptcy court has the power to sift the circumstances surrounding any claims to see that injustice or unfairness is not done in administration of the bankrupt estate." Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939).

■ There is no doubt as to this Court's jurisdiction to determine this controversy in a summary proceeding. Not only is such a determination essential to the administration and reorganization of the estate of the bankrupt, (Cf. Central States Corp. v. Luther, 215 F.2d 38 [10th Cir. 1954]) it also concerns the distribution of property held by the trustee. Cf. Harrison v. Chamberlin, 271 U.S. 191, 46 S.Ct. 467, 70 L.Ed. 897 (1926).

■ Except for the provisions of Section 64 which lists five categories of

**392**

debts having priority over others, the policy of the Bankruptcy Act " * * * has always been to eliminate all special individual priorities and preferences in order to allow creditors to share in the bankrupt estate equally, within their class." In re Pusey and Jones Corp., 192 F.Supp. 233 (D.Del., 1961). See also Young v. Higbee Corp., 324 U.S. 204, 65 S.Ct. 594, 89 L.Ed. 890 (1945).

██ The instruments on which the claims here are based are denominated "demand notes" and "subordinated debenture notes." This fact does not, however, compel separate classification. The names are not significant. All unsecured indebtedness is here presented as a general claim against the estate of the bankrupt, and all holders of unsecured claims are correctly classified as general creditors. See 6 Collier on Bankruptcy, Section 9.13, page 2844. No reason is apparent for extending priority to those general creditors who, by circumstances unrelated to their bargaining for a priority, now find themselves with contracts which may be (arguably, at least) more advantageously worded than those contracts held by other general creditors. The demand note holders gave no consideration for a position superior to that of the debenture note holders; nor did they change their position in reliance upon any subordination clause. Moreover, the debenture note holders neither bargained for nor received any consideration from the debtor for such provision. Because the subordination clauses (such as they are) were passed off upon the debenture note holders by the debtor, who not only knew that the provisions did not express the intentions of those holders, but who knew that the holders intended only to take an unsecured claim against the bankrupt, the note should in good conscience be reformed so as to eliminate any subordination or purported subordination clause. Existence of a subordination provision, if not fraud, is at least a unilateral mistake. See Restatement of Contracts, Section 505.

" * * * [K]nowledge of one party not only that the other party's intention is something different from what the writing expresses, but also what that intention is, is sufficient ground for reforming the writing to conform to the unexpressed intention." Restatement, Section 505a.

See Godsmark v. Bennett's Estate, 52 Colo. 198, 120 P. 151 (1911); Simpson, et al. v. Barber, 74 Colo. 175, 220 p. 235 (1923); Mike Occhiato Mercantile Co. v. Allemannia Fire Ins. Co., 98 F.Supp. 888 (D.Colo., 1951).

Neither the terms of the note in question nor any of the surrounding circumstances gave effective and binding notice to the debenture holders that theirs was an inferior position; that they would partake of the debtor's assets only after all other creditors had been paid in full. If this fact had been unequivocally brought home there would have been few if any subscribers. Thus the inequity in upholding this clause would be palpable. Therefore, this group of creditors is entitled to be relieved from the effects of any subordination agreement which might be read into this note, Appendix "A".

It is concluded that the remedy of reformation is here appropriate and that effect should be given to these notes as though they contained no language even suggesting subordination. See Mike Occhiato Mercantile Co. v. Allemannia Fire Ins. Co., supra, page 891 of 982, Supp., and see Hill v. Stanolind, 119 Colo. 477, 205 P.2d 643 (1949). Accordingly, it is

Ordered that the motion of the holders of the "subordinated debenture notes" be, and is hereby granted, and the Trustee is directed to consider these holders as general creditors of the Joe Newcomer Finance Company to be treated on an equality with the holders of the "demand notes" in the formulation and adoption of any plan of reorganization of the debtor.