In the Matter of **CREDIT INDUSTRIAL CORPORATION, Bankrupt.**

United States District Court
S. D. New York.
Dec. 16, 1965.
Supplemental Opinion Jan. 11, 1966.

Zalkin & Cohen, New York City, for trustees.

Hays, Sklar & Herzberg, New York City, for respondent Leo Levin.

TENNEY, District Judge.

The trustees and respondent Leo B. Levin, separately petition to review the order of the Honorable Asa S. Herzog, Referee in Bankruptcy, dated January 21, 1965, pursuant to Section 39(c) of the Bankruptcy Act as amended, 74 Stat. 528 (1960), 11 U.S.C. § 67 (Supp.1964) (hereinafter referred to as "Act" and cited to the appropriate section of the Bankruptcy Act.)

The trustees of Credit Industrial Corporation, the bankrupt, moved before Referee Herzog for an order subordinating the claims of certain noteholders to the claims of the institutional creditors (hereinafter referred to in the alternative as the "banks") on the basis of an alleged subordination provision contained in the notes entered into between the bankrupt and the noteholders, but to which the banks were not a contracting party.

Six answers were filed by seventeen noteholders, (including Levin.) alleging fifteen defenses, and two asserting counterclaims demanding affirmative relief.

The trustees moved to dismiss the defenses and counterclaims for insufficiency or failure to state a claim upon which relief could be granted and Levin cross-moved for summary judgment.

Referee Herzog, in his decision, dismissed all the defenses and counterclaims asserted in the various answers, except the defense of "non-reliance" which was held to raise a triable issue. Levin was granted leave to amend his answer by asserting as an affirmative defense that the bank creditors did not rely upon the subordination provisions of the subordinated notes as an affirmative defense. His motion for summary judgment was also denied.

Levin (the only noteholder seeking review) petitions for review of the denial of his motion for summary judgment as well as the dismissal of the following affirmative defenses:

(1) That the trustees are not the real parties in interest;

(2) That the trustees' application and claims fail to state claims against Levin upon which relief can be granted;

(3) Fraud by reason of material misrepresentations, false financial statements, sale of unregistered securities by the bankrupt, giving rise to the right to rescind the loan transaction (3d, 4th and 5th affirmative defenses);

(4) That the subordination clause does not apply to bankruptcy; and

(5) That the bank creditors, by their conduct, waived the subordination provisions of the notes and are estopped from taking advantage of said provisions in this proceeding.

The bankrupt herein was engaged in the business of commercial financing and, as is the general business practice, borrowed large portions of its working assets from banks.

■ Levin's first defense in part questions whether the trustees are the proper parties to bring this application, as opposed to the creditor banks. Section 47a(8) of the Act explicitly states that it is the trustee's duty to "examine all proofs of claim and object to the allowance of such claims as may be improper." It is proper for the trustees to take a position on whether allowable claims should be treated on an equal footing.

See In re Royce Dry Goods Co., 133 F. 100 (W.D.Mo.1904).

■■ Since the trustees represent all creditors, they clearly have the right to raise this point. First Nat. Bank of Bay City v. Young's Estate, 41 F.2d 8, 9 (6th Cir. 1930); see 3 Collier, Bankruptcy ¶ 57.17 [2.3] (14th Ed. 1964); Nadler, The Law of Bankruptcy §§ 573, 579 (2d ed. 1965).

The notes, which are the basis of the claims which the trustees seek to subordinate to the bank claims, are substantially alike and in pertinent part provide:

"Until the Corporation shall pay and satisfy in full all of its obligations and each and every one of its present or future loans * * * now in existence or hereinafter incurred from any bank * * * or other institutional organization * * * the Corporation will not make * * * any payment of the whole or any part of this note. * * *"

The notes also provide that no noteholders will receive security and that any payment or security given prior to satisfaction of the obligations to the banks will be received and held in trust for, and as agents of, the banks.

Provision is also made that so long as there be no default in the obligations to the banks, installments of interest may be paid on the notes. Finally, it is provided that the noteholders waive notice "of the acceptance of this subordination provision" by the banks or of reliance by them "upon the subordination herein contained."

Levin, in his seventh affirmative defense, asserts that the subordination provision in his note fails to refer to its applicability in the case of bankruptcy or other insolvency proceedings, and therefore it does not have the effect of subordinating his dividends in this proceeding to the claim for priority of the institutional creditors.

■ "In determining the question of subordination the courts are guided by cardinal principles of equity jurispru-

dence to the end that injustice and unfairness is not done in the administration of the bankrupt estate." Opinion per Referee Herzog, Matter of: Credit Industrial Corp., 63 B 394 at 11 (January 8, 1965) (hereinafter cited as "Referee's decision").

■ The power of the bankruptcy courts to subordinate claims or to adjudicate equities arising out of the relationship between creditors is complete. Sampsell v. Imperial Paper & Color Corp., 313 U.S. 215, 219, 61 S.Ct. 904, 85 L.Ed. 1293 (1941).

Thus, for example, it has been held that subordination will result from the conduct of the parties where equity required it, even though no consensual subordination is involved. Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939).

The language utilized in the notes in question clearly indicates that the noteholders will assume an inferior position as far as receiving payment on their notes is concerned. In addition, the last sentence of each note refers specifically to the waiver of notice of acceptance of the "subordination provision" by any institutional creditor of the corporation.

■ It has long been my understanding that the parties are not prohibited from making contracts for a priority or subordination insofar as they do not impinge upon statutory priorities. In re Aktiebolaget Kreuger & Toll, 96 F.2d 768 (2d Cir. 1938).

While undoubtedly it might be the better practice to provide for the applica-

bility of the subordination provision under conditions of insolvency, including any proceeding under the Bankruptcy Act (Herzog & Zweibel, The Equitable Subordination of Claims in Bankruptcy, 15 Vand.L.Rev. 83, 93 (1961)), I do not find its absence fatal.

The subordination clauses such as the one involved herein are important in obtaining credit, and their attractiveness or appeal is in part due to the superior status obtained by those extending credit in reliance on the said clause—a superior status which becomes most important when the debtor is unable to pay its debts and under circumstances similar to those existent herein. Cf., In re Aktiebolaget Kreuger & Toll, supra, 96 F.2d at 770.

Neither the Referee nor I have been referred to any cases, nor has my research revealed any, which hold that a subordination provision similar to the one at bar will not be enforced in the bankruptcy court in the absence of express language in the contract alluding to bankruptcy proceedings.

The language used in providing for subordination is in broad terms and all encompassing, and in no respect excludes or prohibits application in bankruptcy proceedings.

■ Accordingly, I find that the Referee's decision, in finding the subordination provision applicable to bankruptcy dividends, proper.[1]

Levin, as part of his first defense, asserts that neither the institutional creditors in the additional proofs of claim nor

---

1. The Referee, in reaching his decision, stated: "In certain cases in which the precise language of the agreements did not call for subordination an intent to subordinate was inferred from the nature of the facts and circumstances. See In re George C. Burns Co., (7th Cir.) 256 F. 840; In re Geo. P. Schinzel & Son, Inc. (S.D.N.Y.) 16 F.2d 289.
If this be so, then certainly an express agreement to subordinate as here providing that all bank creditors must be paid in full before any noteholder may be paid must be held to be applicable to bankruptcy dividends. * * * [I]n almost

all instances where courts have given effect to subordination agreements the eventuality of bankruptcy was not specifically alluded [to] therein." Referee's Decision, supra, at 12.
In Cherno v. Dutch American Mercantile Corp., (2d Cir. Nov. 9, 1965), 353 F.2d 147, the subordination agreement was entered into in April of 1960, and made no reference to bankruptcy. (See Appellant's Appendix on Appeal at 30a–32a). Apparently the bankrupt became insolvent on or about August 19, 1960. (Id. at 34a.)

the trustees in their application allege, directly or indirectly, that the loans which the institutional creditors made to the bankrupt, for which proofs of claim have been filed in this proceeding, were in fact made in reliance upon or induced by the subordination provisions of his (Levin's) note or others like it. Levin, assuming the correctness of the aforementioned point, goes on to assert that no other basis has been shown or alleged for departing from the underlying policy of equity and the bankruptcy statutes favoring equality of distribution among unsecured creditors in the absence of a compelling showing that the denial of priority would work an injustice.

Levin, then, in his second defense, states that the trustee's application and the claims filed by the banks fail to state claims against him upon which relief can be granted.

I will initially discuss the latter portion of the above-cited first defense and the second defense, leaving the balance for subsequent consideration.

As was pointed out by the Referee in his decision, express agreements to subordinate are uniformly enforceable in proceedings under the Bankruptcy Act. "Section 64b of the Bankruptcy Act, as amended, 11 U.S.C.A., § 104(b), for reasons of public policy, creates priorities regardless of the parties' contracts and overrides inconsistent covenants. But this does not mean that the parties are prohibited from making contracts for a priority or subordination insofar as they do not impinge upon statutory priorities. Section 65a of the act, 11 U.S.C.A. § 105 (a) means no more than that dividends paid to creditors shall be pro rata except where there is a priority given by law or by lawful contractual arrangement between the parties. Bird & Sons Corporation v. Tobin, 8 Cir., 78 F.2d 371, 100 A.L.R. 654." In re Aktiebolaget Kreuger & Toll, 96 F.2d 768, 770 (2d Cir. 1938); see also, Wyse v. Pioneer-

Cafeteria Feeds, Ltd., 340 F.2d 719, 722–723 (6th Cir. 1965).

Agreements to subordinate in favor of a specific creditor or group of creditors are so enforceable. Bird & Sons Sales Corp. v. Tobin, 78 F.2d 371, 100 A.L.R. 654 (8th Cir. 1935); Matter of Dodge-Freedman Poultry Co., 148 F.Supp. 647 (D.N.H.1956), aff'd sub nom. without opinion, Dodge-Freedman Poultry Co. v. Delaware Mills, Inc., 244 F.2d 314 (1st Cir. 1957); Matter of Handy-Andy Community Stores, Inc., 2 F.Supp. 97 (W.D.La.1932). See also Wyse v. Pioneer-Cafeteria Feeds, Ltd., supra.

Thus, for example, subordination agreements have been enforced for the benefit of groups or classes; various combinations have been sustained, such as the claims subordinated to all other obligations, present and prospective, in Bank of America Nat. Trust & Sav. Ass'n v. Erickson, 117 F.2d 796 (9th Cir. 1941). In Bird & Sons Sales Corp. v. Tobin, supra, a creditor group subordinated their existing claims to all future indebtedness or liabilities of the bankrupt; debentures were subordinated to all other debts in In re Aktiebolaget Kreuger & Toll, supra; and the debentures were subordinated to all bank debts, notes and other commercial paper of certain maturity and renewals, certain other short-term indebtedness and future debentures in Matter of Nat'l Discount Corp., 212 F.Supp. 929 (W.D.S.C.), aff'd sub nom. Austin v. National Discount Corp., 322 F.2d 928 (4th Cir. 1963). See generally, 3 Collier, Bankruptcy ¶ 65.06 (14th ed. 1964); Annot. 100 A.L.R. 660 (1936).

Since I have already indicated that the instant subordination provision is applicable for enforcement in bankruptcy proceedings, I find Levin's defense of legal insufficiency untenable.[2]

I now proceed to the crux of the case presented herein, namely, the issue of whether reliance on the subordination

---

**2.** Insofar as Levin asserts legal insufficiency on the failure of the banks to plead or prove reliance, that issue will be considered *infra*.

provisions must be shown by banks extending credit subsequent to the execution of these subordination clauses, and, if so, upon whom the burden of pleading and/or proving reliance and/or non-reliance falls.

The trustees petition to review that portion of Referee Herzog's Order which failed to dismiss the defense of non-reliance upon the subordination provisions of the notes by the institutional creditors, asserted by noteholders Rose Friedman, Edith Keller, Beverly Keller, Pauline Goldstein, Fannie Winnick, and Samuel Coslow.

The trustees also petition to review that part of the Referee's Order which permitted amendment of their answers to allege non-reliance as a defense by noteholders Leo B. Levin, Florence Schwartz, Milton Schwartz, Lawrence S. Kryle and Flora Haltenbach; and Benjamin Fried, Marcus Fried, Arthur A. Hilton, Gertrude L. Hilton and Edward H. Bottner.

As set forth in their third counterclaim, it was the position of noteholders Rose Friedman, Edith Keller, Beverly Keller, Pauline Goldstein, and Fannie Winnick (who are not seeking review herein) that most of the loans had been obtained from the institutional creditors prior to the execution of their notes containing subordination provisions; further, that the bank loans were not predicated upon, based upon or made in reliance upon any alleged subordination agreement made by them with the bankrupt, since the said subordination agreements were not in being at the time said bank loans were made to the bankrupt, and that as to said outstanding bank loans and advances which were in existence on the dates of the execution of their respective loans, such advances are not subordinated to the institutional creditors who were creditors of the bankrupt as of those dates.

In addition, claimant Samuel Coslow (who also is not seeking review herein), in his third affirmative defense made the broad assertion that there was no proof

of reliance by the institutional creditors on the terms of this note.

The trustees urge that a strict contractual theory should govern the determination of whether the institutional creditors should have to prove that they relied on the subordination provision in order to prevail.

They suggest that a subordination provision is merely a third-party beneficiary agreement in which the subordinating creditor is the promisor, the obligor is the promisee, and the creditor or group of creditors intended to have superior rank is the third-party beneficiary. Matter of Nat'l Discount Corp., supra, 212 F.Supp. at 932–933.

They then assert that an explicit promise such as the subordination provision made by the noteholders to the bankrupt for the benefit of the bank or institutional creditors creates an express contractual relationship between the promisor and the third party: 3 Corbin, Contracts § 563 at 292 (1960); 4 Corbin, supra, § 779J at 59–61 (1951).

In addition, they point out that a third party, such as the institutional creditors, may avail itself of a contract made for its benefit even though it had no knowledge of it, and even though it was a stranger to the contract, as was the case in Beck v. Reynolds Metal Co., 163 F.2d 870 (7th Cir. 1947) (in which a salesman was allowed to enforce a clause for recovery of commissions due him in a contract between his former employer, a vendor, and a vendee, who assumed all responsibilities of the vendor with respect to unfilled orders).

The trustees also observe that another element which is present and supports the position of the banks is that they are a member of the described class (i. e. "bank * * * or other institutional organization), citing Marranzano v. Riggs Nat. Bank, 87 U.S.App.D.C. 195, 184 F.2d 349 (1950).

It is also claimed that future creditors can enforce a contract intended for their benefit even though it was not until after the contract was made that they became

creditors, which the trustees claim to be the situation in the case at bar. 4 Corbin, supra, § 781 at 70–73; Bradley v. McDonald, 218 N.Y. 351, 113 N.E. 340 (1916); Coster v. Mayor, 43 N.Y. 399 (1870).

The trustees further request the application of the reasoning utilized in Chase Manhattan Bank v. May, 311 F.2d 117, 120 (3d Cir. 1962), cert. denied, 372 U.S. 930, 9 L.Ed.2d 733 (1963), wherein the Court held that a bank suing upon a guaranty made for its benefit need not prove reliance upon the guaranty. Similarly, the trustees argue that the third-party institutional creditors need not prove reliance upon the subordination agreement made for their benefit.

In sum, the trustees' position is that the institutional creditors as third-party beneficiaries are entitled to prevail over the noteholders by virtue of the subordination clause contained in the note between the bankrupt and the noteholders without requiring the institutional creditors to allege or prove reliance upon the subordination clause before they made loans to the bankrupt.

While as broad propositions of third-party beneficiary contract law, the above-cited maxims may be accepted herein, I question their application to the instant proceedings in bankruptcy and to the enforcement of subordination agreements in the bankruptcy context.[3]

The very basic question thus presented is whether in bankruptcy proceedings a subordination agreement is to be enforced in favor of a creditor who is not a party to the agreement and who neither alleges nor proves that he relied upon or was induced by the subordination clause to make the loan to the bankrupt for which a superior position is sought.

The noteholders take the position that reliance is essential on the part of the institutional creditors, while the latter assert it is unnecessary. In approaching the question, the objective of the

bankruptcy proceeding must be reiterated and accepted as the basic premise from which all subsequent arguments must, under most circumstances, stem.

As was stated by the Supreme Court in Sampsell v. Imperial Paper & Color Corp., 313 U.S. 215, 219, 61 S.Ct. 904, 907, 85 L.Ed. 1293 (1941), "the theme of the Bankruptcy Act is equality of distribution." The extent to which this mandate is followed is best illustrated by the case of Miller v. Sulmeyer, 299 F.2d 102, 104–105 (9th Cir. 1962), affirming sub nom., Matter of Delcon Corp., 194 F.Supp. 111 (S.D.Calif.1961).

It has also been reiterated on many occasions that "[t]he broad purpose of the Bankruptcy Act is to bring about an equitable distribution of the bankrupt's estate among creditors * * *." Kothe v. R. C. Taylor Trust, 280 U.S. 224, 227, 50 S.Ct. 142, 143, 74 L.Ed. 382 (1930).

A court of bankruptcy, in passing on the allowance of claims, must sit as a court of equity and must, consistent with the Bankruptcy Act, be guided by equity and good conscience. Matter of Joe Newcomer Fin. Co., 226 F.Supp. 387, 391 (D.Colo.1964) and cases cited therein.

Blind adherence to the enforcement of subordination agreements in bankruptcy, based on strict third-party beneficiary contract law, is contrary to the equitable considerations and principles which permeate the rule of distribution of dividends among creditors similarly situated. "Although it is sometimes startling to find that one not a party to an agreement to subordinate may secure the benefits of the agreement, some courts have reached just such a result without further elucidation [citing cases at note 68]. In keeping with the general contractual framework, these holdings might be sustained on a third-party beneficiary doctrine or on the rationale of a continuing offer to subordinate being accepted by prospec-

---

3. Matter of Nat'l Discount Corp., supra, was a bankruptcy proceeding. However, as will be noted *infra*, in that case as well reliance by the third-party beneficiary was shown.

tive creditors as they extend credit. We think, however, that only where subsequent creditors rely on a subordination agreement should a court of equity employ the principle of estoppel to subordinate." Herzog & Zweibel, The Equitable Subordination of Claims in Bankruptcy, 15 Vand.L.Rev. 82, 92 (1961).

In essence, then, where the subordination provision is interpreted under third-party beneficiary contract rules, the contract of the parties is enforced in the bankruptcy proceeding. However, an added element of proof must be shown before the contract is so enforceable; to wit, reliance on the part of subsequent creditors.

The cases illustrate that the courts will not mechanically enforce the subordination agreement in bankruptcy proceedings, but will scrutinize the agreements and the circumstances affecting subordination, whether they are contained in debentures, notes, or other written agreements.

While it cannot be stated that reliance was the only factor taken into consideration in making a determination whether to enforce or to refuse enforcement of the particular subordination agreement, in each of the following cases it was specifically mentioned as a reason for or against enforcement of the provision. The fact that the relationship in each of the illustrative cases is slightly different from that of the parties in the case at bar is not determinative.

In Bird & Sons Sales Corp. v. Tobin, 78 F.2d 371, 100 A.L.R. 654 (8th Cir. 1935), most but not all of the bankrupt's then-existing creditors signed an agreement whereby the creditors so signing agreed to subordinate the payment of the then-existing indebtedness owing to them by the bankrupt to the prior payment and satisfaction of all future indebtedness or liabilities of the bankrupt. One of the signatories questioned the subordination of his indebtedness as being violative of Section 65a of the Bankruptcy Act, which provides: "Dividends of an equal per centum shall be declared and paid on all allowed claims, except such as have priority or are secured." The Court found that the bankruptcy court may conform distribution of the estate to accord with the rights of the parties as fixed by their own contract as long as it did not violate any public policy or the spirit of the bankruptcy law. The Court further decided that since the contract was entered into by the objecting creditor "and *relied upon* by those who extended credit on the faith of it" (id. at 373) (emphasis added) in the hope that the bankrupt could be maintained as a going concern, the subordination agreement was properly enforceable.

Matter of Temple of Music, Inc., 114 F.Supp. 759 (E.D.N.Y.1953), aff'd without opinion, 220 F.2d 749 (2d Cir. 1955), concerned the construction and interpretation of a subordination clause embodied in the debenture. The trustees, in support of their motion for subordination of the claim of the Estate of Herman S. Busloff, Inc., urged that the failure to subordinate the debenture claim would constitute a fraud on creditors who furnished goods to the bankrupt in reliance on the clause. The Court, in disposing of this argument, indicated that there was *"nothing in the record to show that the creditors either knew of the existence of the subordination clause* [or] *relied on it."* Id. 114 F.Supp. at 761. (Emphasis added.)

Matter of Nat'l Discount Corp., 212 F.Supp. 929 (W.D.S.C.1963), was a case involving the enforcement of a subordination provision contained in an issue of capital debentures. Before National Discount Corporation was adjudged a bankrupt, it was engaged in the finance business (as was the bankrupt in the case at bar) and it issued capital debentures which contained in part the following provision: "The indebtedness evidenced by the debentures issued hereunder, and all renewals and extensions thereof, will at all times and in all respects be wholly subordinate and junior in right to (a) all bank debts, notes and other commercial paper having a stated maturity of not more than twelve (12)

months from date of origin, * * *." (Id. at 930.) Two other classes of senior creditors were also included in the debenture.

The circulars offering the debentures for sale to the public designated them as "20 Year Capital Subordinated Debentures" and described them as containing the same subordination provision. The books and affairs of National Discount were audited annually by independent certified public accountants and the annual audit reports were distributed to the bank line creditors, and the audit reports listed all the oustanding debentures in the company's balance sheet as "Twenty Year 6% Subordinated Debentures" and included the exact language of subordination used in the debentures. Four companies which were related to the bankrupt and which held some of the debentures in question objected to the enforcement of the subordination provision of the debentures on the ground that the transactions by which they acquired the debentures from the bankrupt were not at arm's length and therefore suspect. In enforcing the subordination provision the Court reiterated a number of times throughout its decision that "[t]o deny its validity in bankruptcy would destroy a very essential term of the contract on which the bank creditors *relied in extending credit* to the National Discount Corporation." (Id. at 933.) (Emphasis added.)

The Fourth Circuit, in affirming the District Court (Austin v. National Discount Corp., 322 F.2d 928, 929 (4th Cir. 1963)), very specifically noted that "[t]he district court found that the lending banks advanced the funds to the bankrupt in reliance on the subordinated nature of the debentures, and that they neither knew nor had sufficient information so that they should have known of the suspect nature of the debenture transactions."

Matter of Joe Newcomer Fin. Co., 226 F.Supp. 387 (D.Colo.1964), is another example of the pains to which the courts go in scrutinizing the requested enforcement of a subordination provision in bankruptcy proceedings. The alleged subordination provision was contained in debenture notes issued by the bankrupt. The Court found the first provision so ambiguous in its wording as to make it difficult to hold that general subordination was an express provision of the instrument. The second provision for subordination purported to set up a trust, by which the claims of the debenture holders would have been subordinated to other general creditors at least as far as the special fund was concerned. The Court found that since no fund was in fact created, there were no assets which could be distributed on a preferred basis, and therefore the said clause was ineffectual in creating a general subordination. The Court further noted that the equity of reliance which was a factor in supporting subordination in Matter of Nat'l Discount Corp., supra, was lacking; in other words, "there * * * [was] no evidence that demand note holders relied upon the subordination provisions in advancing funds to the debtor. Nor [was it] * * * a case where the existing creditors agreed to subordinate their claims in order to obtain additional financing for the debtor." Accordingly, the subordination provision could not be upheld on the theory that the demand noteholders were creditor-beneficiaries of a third-party beneficiary contract between the bankrupt and the subordinated debenture noteholders. The Court went on to reform the notes as though they contained no language even suggesting subordination.

In another instance of enforcement of contractual subordination, Matter of Endicott Co., 238 F.Supp. 163, 164 (E.D.Pa. 1964), aff'd, without opinion, 341 F.2d 295 (3rd Cir. 1965) the Court noted that "[t]he Referee found that the bank, in extending credit to the corporation [bankrupt], relied in part on the belief that the claims of the Endicotts were subordinated to its claims."

The agreement was enforced even though the officer of the bank who last handled the Endicott account was unable to find the agreement until just before the bankruptcy. There was, however, evidence that the officials of the bank

were aware of the fact that such agreement had been executed and lodged with the bank.

Even though each of the above cases involved a written instrument containing a subordination clause, it was either enforced or rejected based on its language, substance and surrounding circumstances. Of the cases noted in which the subordination clause was enforced, reliance was either proved or assumed present.

In addition, I have been referred to no case, nor were any cited to the Referee, considering the question of enforcing a subordination agreement in bankruptcy where reliance was neither proven nor assumed present and which held that reliance was not a factor to be considered, even though, as noted above, under ordinary third-party beneficiary contract law arising in contexts other than bankruptcy, reliance is not a matter of importance.

Although it may be that the element of reliance has not been raised before as an essential factor in order to enforce a subordination agreement under the present circumstances, it is clear that reliance as an equitable consideration has either been shown to be present or has been assumed to be present in the cases in which subordination has been enforced.

The rationale behind such a requirement was broadly set forth in Austin v. National Discount Corp., supra, 322 F. 2d at 929:

"The record makes it clear that it is the general business practice of finance companies, such as National Discount Corporation, to borrow large portions of their working assets from banks. The lending banks, in deciding the amount they will permit the finance company to borrow, rely to a large extent on the amount of capital invested in the finance company. In determining the amount of invested capital these banks include long-term indebtedness that will be subordinated to the loans the banks will make. This is based on the realization that the sale of such subordinated debt, as does the sale of capital stock, swells the assets of the finance company available for operating use without increasing the amount of debt that will share the available assets on a parity with the banks in the event of bankruptcy."

As was noted earlier, the bankruptcy court is not bound to accept all the claims submitted, but "[i]n the exercise of its equitable jurisdiction * * * has the power to sift the circumstances surrounding any claims to see that injustice or unfairness is not done in administration of the bankrupt estate." Pepper v. Litton, 308 U.S. 295, 307–308, 60 S.Ct. 238, 246, 84 L.Ed. 281 (1939).

Accordingly, I agree with the Referee's ruling (at 14–15) "that as to bank creditors who come into existence subsequent to execution of the various subordinated notes it will be necessary for the trustee to prove reliance upon the subordination provisions before this court can properly order that the note claims be subordinated."

Having affirmed the holding of the Referee with respect to the necessity of showing reliance, I will now consider the problem of such a holding as it relates to banks lending money prior to the execution of these subordinated notes.

Banks thusly situated cannot by definition show reliance since it is difficult for a person to rely on something later coming into existence unless the bankrupt in acquiring the money from them represented to them that it was his intention to borrow funds from others and provide in those subsequent notes subordination provisions and in reliance thereon money was lent. However, in that case reliance may very possibly be shown. The problem relates to the prior banks which under no circumstances can show reliance on this provision.

The Referee's opinion is not clear as to the status of prior lending banks. However, in limiting the class of those who can take advantage of the subordination clause to those banks which relied on the provision, he apparently held that these prior banks which cannot show re-

liance are not so situated and, accordingly, do not have a rank superior to that of the noteholders. With this decision I am in accord.

As already stated, the principle that permeates dividend distribution among general unsecured creditors is one of equality and the courts are guided by cardinal principles of equity jurisprudence so that injustice and unfairness do not result in the administration of the bankrupt's estate.

Thus equality is the rule and departure from equality the exception—the exception to be followed only when warranted.

The Referee has departed from that principle of equality herein where banks have relied on the subordination clause, in effect engrafting onto normal third-party beneficiary contract law the concept of reliance in order to enforce those contracts in bankruptcy, and on purely equitable grounds such should be the case since these banks were led to believe that they would be superior in rank to the noteholders and may very well have advanced funds solely on that representation as contained in the note.

In the instance of the prior banks, this element of reliance cannot be shown, and, accordingly, there is no reason (either in equity or under this hybrid form of third-party beneficiary contract law) to depart from the normal rule. These banks were in no way disadvantaged by the execution of these notes, as were subsequent banks which relied on them and were induced as a result of their existence to lend money, and in fact these prior banks were, if anything, advantaged in that by reason of these notes the bankrupt's estate was swelled and the chances better that insolvency and bankruptcy could be avoided.

Accordingly, there is no reason to put these prior banks on any different footing than subsequent banks which did not rely, and, therefore, as to them the general rule of equality is to be applied.

Levin next urges that the Referee erred in dismissing his third affirmative defense. Levin claims the right to rescind the loan transaction on account of fraud and to receive the restoration of all monies loaned to the bankrupt, together with interest, which right of rescission is asserted to be prior and superior to the claims of the institutional creditors. Specifically, Levin alleges that he was induced to make the loan to the bankrupt by the following material misrepresentations:

(a) That notwithstanding the subordination provisions of the note the bankrupt intended to and would repay Levin upon demand;

(b) That the business of the bankrupt would be conducted in a proper and businesslike fashion; and

(c) That the officers of the bankrupt intended personally, on 90 days' notice, to purchase his (Levin's) note from him upon request.

Levin also seeks review of the Referee's Order striking his fourth affirmative defense which asserts that he (Levin) had the right to rescind his loan to the bankrupt on account of fraud of the bankrupt in inducing him to make the loan and extend the maturity date thereof and to refrain from demanding or taking action to secure repayment, and that such rescission is not subordinate to the claim for superiority of the institutional creditors. Levin incorporates the aforementioned material misrepresentations in his fourth affirmative defense as well. In essence, Levin's fourth defense is that he extended the maturity date of the note by reason of continuing misrepresentations as to the operations of the business and by false financial statements.

Levin urges that the parties seeking to enforce a subordination agreement in bankruptcy, even if they prove reliance, are subject to the subordinating creditor's right to rescind, and that what the institutional creditors acquired under the subordination agreement was a right in equity to Levin's claim against the bankrupt, not legal title to the assets now held by the trustees nor legal title to Levin's cause of action against the bankrupt on the note. Although both Levin and the institutional creditors claim an equitable interest, Levin claims his equity of rescission arose prior in time to the

equitable interests asserted by the institutional creditors. He also suggests that the institutional creditors' interest arose when they made the loans to the bankrupt for which they have filed proofs of claim and when they relied upon the subordinated notes, and that all of the institutional creditors' claims thus arose subsequent to the fraud perpetrated upon Levin. Since his equity is prior in time, Levin asserts that it is prior in right and should prevail.

It would seem that Levin's theory as it relates to both these defenses is really beside the point. While the noteholders may have a right to rescind their contracts as against the bankrupt, I question that fraud as between the bankrupt and the noteholders is available as a defense to subordination of the noteholders' claim against banks which in good faith loaned money to the bankrupt in reliance upon the subordination agreement.

Thus I am of the opinion, in accord with the Referee's decision, that the right to rescind between the noteholders and the bankrupt could not affect the rights of the bank creditors who, in good faith, advanced credit in reliance upon the subordination provisions of the note.

As was mentioned in Matter of Nat'l Discount Corp., 212 F.Supp. 929 (W.D. S.C.), aff'd sub nom. Austin v. National Discount Corp., 322 F.2d 928 (4th Cir. 1963), to hold otherwise would strike down the rights of the bank creditors acquired in good faith, for value, and without knowledge of any infirmity, if any exists.

" * * * [A]ny right of rescission between the parties could not affect the right of the bank creditors who, in good faith, advanced credit in reliance upon the contract." (212 F.Supp. at 933)

In addition, in the case at bar there is no allegation by Levin that the bank creditors knew of or suspected the alleged fraud. The following language in Austin v. National Discount Corp., supra, 322 F.2d at 931, is particularly apposite herein. "In the absence of knowledge by the banks, either actual or constructive, of the suspect nature of the subordinated debenture transaction, we can see no equitable basis for refusing to enforce the subordination provision in the instant case."

Levin finally points out that, although the Referee based his decision in dismissing the third and fourth defenses in part on the fact that the banks had relied on the subordination provision, no evidence was adduced below in support of this point. He then urges that the dismissal of these defenses should have been held in abeyance pending the trial on the issue of reliance, since if, as he suggests, his equity of rescission is superior to the equity of the banks even if they did rely on the subordination clause, a fortiori, he is in a superior position if they did not rely.

As just noted, if it can be shown that the banks relied on this clause, I am in full accord with the Referee that they are in a position superior to that of Levin, even if in fact fraud be shown (and, of course, for the purposes of a motion to dismiss the allegation of fraud is assumed to be true).

Is the situation different where fraud is shown and the banks did not rely on the subordination clause? While factually there is, of course, a difference, apparently the Referee was of the view that legally Levin, where reliance is not shown, is in no better position if there is a rescission due to fraud than if there is none.

Equality of distribution is the theme of the Bankruptcy Act—Moore v. Bay, 284 U.S. 4, 52 S.Ct. 3, 76 L.Ed. 133 (1931). The Referee has held (and I am in accord with that holding) that by reason of the subordination clause, if subsequent banks lent money in reliance thereon, they have a status superior to that of Levin. However, absent reliance, they no longer can derive the benefit of the subordination clause, and are thus the same as all general creditors entitled under general principles to share pro rata in the estate. Accordingly, in that case the clause in Levin's note would have no

force and effect, so he would in substance be requesting the rescission of that part of a contract no longer legally effective. Since the banks had no part in the fraud and there is thus no reason to equitably subordinate their claims to that of Levin, the most that he could thus gain by rescinding would be equality of distribution. However, he achieves the same result even if there is no rescission, since, absent reliance by the banks, the subordination clause is of no consequence, and the general principle of equality of distribution would lead to the same distribution of funds.

The situation is similar with respect to prior banks. Since they cannot show reliance they share equally with the noteholders. Even if fraud existed when the noteholders lent money (at a point in time subsequent to the extension of credit by these banks), knowledge of the fraud is of course not imputable to these banks since they could not have known of events to accrue in the future. Accordingly, they should be placed in neither a superior nor inferior position with relation to the noteholders, even if fraud existed as between the bankrupt and the noteholders.

Similar considerations apply to the Referee's determination on the fifth defense since its provability will have no effect on the dividend distribution as well.

Levin, in his fifth affirmative defense, seeks rescission of the loan transaction on account of fraud based on the following averments: That the notes issued to him (Levin) by the bankrupt "were securities within the meaning of § 2(1) of the Securities Act of 1933, for which no registration statement had been filed with the S.E.C., all of which was known to the 'institutional creditors', and were sold to * * * [him] by use of the mails and instruments of commerce, in violation of §§ 12(2) and 17 of the Securities Act of 1933, § 10(b) of the Securities Exchange Act of 1934, and 10b–5 of the Rules issued under the Securities Exchange Act of 1934 by reason of the fact that the bankrupt failed to advise him that no registration statement in connection with the issuance of said securities had been filed with the U. S. Securities and Exchange Commission as required by law, and because the sale of the notes to * * * [him (Levin)] was made through untrue statements of material facts, the omission to state material facts, concealment of material facts, false financial statements, and the use of deceptive and fraudulent devices, schemes and artifices."

While it is true that Levin does allege in his fifth affirmative defense that the institutional creditors knew that the notes "were securities within the meaning of § 2(1) of the Securities Act of 1933, for which no registration statement had been filed with the S.E.C.," it is not alleged that the banks knew of any fraud, material misstatement or suspicious circumstances as between the bankrupt and Levin.

The Referee, with respect to this defense, held "that fraud as between bankrupt and noteholders is not available as a defense to subordination of the noteholders' claim against banks which loaned money to the bankrupt in reliance upon the subordination provision." (Referee's Decision at 6–7.)

Based on the considerations heretofore noted with respect to the third and fourth defenses, the Referee's Order will be affirmed. Even if the defense is proven, and whether reliance is shown or not it will not affect the distribution of dividends.

In view of this holding, the issue of the statute of limitations is moot as well.

I finally pass to Levin's motion for summary judgment, intertwined with which is his averment of the legal insufficiency of the claim of the banks and trustees as filed.

His argument is fourfold:

(1) the banks must plead reliance;

(2) the banks must prove reliance;

(3) not having pleaded reliance and the six-month period for filing claims having elapsed, they are barred from doing so now and, accordingly, their claims as filed are legally insufficient; and

(4) not having proven reliance even though afforded an opportunity to do so below, the motion for summary judgment should be granted.

■■■■ Irrespective of whether the banks fully participated below or not, the motion for summary judgment must be denied. The Referee acknowledged, as do I, that "[a]ttention has not been called to any authoritative precedent" (Referee's Decision, supra, at 15), with respect to the reliance issue. It would be decidedly inequitable to preclude the banks from submitting proof on an issue which, in good faith and based on the lack of authoritative precedent contra, they did not consider essential to their claims. Accordingly, having now been told both by the Referee and myself that an essential element of their claim is proof of reliance, the banks will be afforded an opportunity to prove that issue. Levin's motion for summary judgment was properly denied.

Insofar as Levin argues with the Referee's determination placing on him the burden of pleading non-reliance and on the banks the burden of proving reliance, he again is pressing form over substance.

The Referee gave no reason for placing the burden of pleading on Levin, rather than placing it on the party having the burden of proof, i. e., the banks. However, I do not consider the issue of great import in this case for, even if I were to reverse the Referee and place the burden of pleading on the banks, I would, on my own motion, permit them to amend their claims to include the issue of reliance.

"It is well established that if there is upon the record in the bankruptcy proceedings within the six months prescribed by § 57 n, anything sufficient to show the existence, motive and amount of a claim it may be amended even after the expiration of the period. [186] * * * [A]mendments offered after expiration of the six-months' period will be more closely scrutinized. They must be genuine 'amendments' as against entirely new claims. [190]

\*　\*　\*　\*　\*　\*

Whether or not an amendment should be allowed is largely a matter of the court's discretion. \* \* \*

There is an increasing emphasis at least in opinions of the Second Circuit in determining the permissibility of amendments after the period for filing claims has elapsed on whether anyone has changed his position to his detriment in reliance on the original statement of facts." [200] 3 Collier, Bankruptcy ¶ 57.11 at pages noted in brackets (14th ed. 1964); see Nadler, The Law of Bankruptcy § 572 (2d ed. 1965).

Based on these criteria, can it be seriously argued that amendment of the proof of claim would not be permitted herein? I think not.

In interpreting Section 57 n of the Act, the analogous Rule 15(a) of the Federal Rules of Civil Procedure is utilized.

The thrust of Rule 15(a) has been stated as follows:

" 'It re-emphasizes and assists in attaining the objectives of the rules on pleadings; that pleadings are not an end in themselves, but are only the means to a proper presentation of a case; that at all times they are to assist, not deter, the disposition of litigation on the merits.' 3 Moore's Federal Practice ¶ 15.02.

The liberal terms of Rule 15(a) have been noted, and there is no need to cite the cases supporting the liberal allowance of amendments under it. It is necessary, however, to consider the relation back problem which arises from the fact that there is here a limitations provision applicable. Rule 15(c) provides that the amendment relates if it arose out of the conduct, transaction or occurrence set forth or attempted to be set forth in the original pleading." Matter of Rhine, 213 F.Supp. 527, 535 (D.Colo.1963).

No reason, either equitable or legal, has been proffered herein which would move the Court to prevent an amendment of the Additional Proof of Claims filed

by these banks. Since leave to amend would in any event be given, I will let stand the Referee's determination permitting the noteholders to amend their answers and assert non-reliance.

The petition to review is disposed of as noted above.

So ordered.

SUPPLEMENTAL MEMORANDUM

This Court's memorandum-opinion, dated December 16, 1965, is amended as follows:

Levin, in his eighth defense, states that the institutional creditors knew, had reason to know, and were on notice, that it was the practice of the bankrupt to repay part or all of the monies loaned on subordinated notes to the holders upon demand and failed to take any action to prevent the bankrupt from continuing this practice or to enforce against the noteholders any of the subordination provisions of this note or advise the noteholders of any intention strictly to enforce the terms of the subordination provisions.

Levin's position is to the further effect that the bankrupt was thereby enabled to borrow substantial sums from him and members of the public generally on subordinated notes and to persuade and represent to such persons who relied thereon that their investments would not be subordinated to institutional creditors.

Levin urges that, on the basis of their foregoing conduct, the institutional creditors have waived their right to enforce the subordination provisions of the note against him, and are further estopped from asserting such provisions to his detriment.

The Referee, with respect to these defenses, observed:

"Of course, the gist of these defenses is that the banks waived the subordination provisions of the notes and that they are estopped from taking advantage of such provisions in this proceeding. The claimants who set up this defense do not assert a specific waiver as to them, but

rather rely on a general course of conduct engaged in by the bankrupt with the knowledge and implied consent or sanction of the bank creditors. I do not see that a general course of conduct by the bankrupt, with or without express or constructive knowledge of the bank creditors, can affect the subordination agreements in general. I see each of the subordinated notes as a separate and distinct transaction, each as a separate contract which I must enforce as written." Opinion, per Referee Herzog, Matter of: Credit Industrial Corp., 63 B 394 at 14 (January 8, 1965).

In addition, the noteholders do not aver at what point in time (i. e., when with relation to the execution of their notes as compared to the dates that the banks lent money) the bankrupt engaged in this practice acquiesced in by the banks as it relates to their specific notes.

Levin, in his brief, does not in any way amplify on this defense and concedes "[t]hat the same evidence dealing with reliance will be pertinent on the issues of waiver and estoppel." The close intertwine of these two issues is further revealed by the statement in the brief of Samuel Coslow (who is not seeking review herein) that "[t]here can be no other finding other than that the banks knew of the bankrupt's practice in repaying some of the loans made by creditors at the time they advanced funds to the bankrupt."

Based on these arguments, on the defenses as proffered, and on the record before him, the Referee held as follows:

"If banks when they became creditors knew and acquiesced in the bankrupt's practice (if indeed there was such a practice) to make payments in whole or in part to the holders of the subordinated notes, this may well be a fact to be considered in determining the question of reliance upon the subordination." Referee's decision at 16.

The defense was accordingly dismissed with leave to Levin to amend his answer

by asserting by way of affirmative defense that the bank creditors did not rely upon the subordination provisions of the subordinated notes.

As noted in this Court's memorandum-opinion of December 16, 1965, the subsequent banks must prove reliance on the subordination agreement in order to take advantage of its benefits. I agree with the Referee that a finding of acquiescence in a certain practice by the banks when the banks lent money to the bankrupt would very seriously dilute what amount of reliance they may have placed on the agreements. As to the banks that lent money prior to the time that these noteholders executed the subordination agreement, I have held that they cannot acquire a superior position by reason of this clause and thus as to them the issue of waiver and estoppel is inapplicable. Accordingly, I affirm the Referee's dismissal of the defenses of waiver and estoppel as set forth in the answers filed, since on the present posture of the record the very essence of a showing of reliance precludes a showing of facts upon which a waiver and estoppel could be predicated.

So ordered.